HARRY F. SHANNON, DIXIE SHANNON (FORMERLY DIXIE H. SMITH), ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 53038–53044.    Filed January 28, 1958.

---

[1] Proceedings of the following petitioners are consolidated herewith : James A. Hedgecoke, Myrtie Maxine Hedgecoke, Docket No. 53039 ; Hollis F. Atkinson, Sidney S. Atkinson, Docket No. 53040 ; Jack B. Lankford, Jewel H. Lankford, Docket No. 53041 ; R. D. Mills. Nona T. Mills, Docket No. 53042 ; Estate of E. L. Morris, Deceased, Garland H. Morris (now Garland H. King), Docket No. 53043; Garland H. King (formerly Garland H. Morris), Docket No. 53044.

*Arthur Glover, Esq.*, and *Walter Russell, Esq.*, for the petitioners.
*Roy E. Graham, Esq.*, for the respondent.

FISHER, *Judge:* This consolidated proceeding involves deficiencies in income tax determined against petitioners as follows:

| Petitioner | Docket No. | Year | Amount |
|---|---|---|---|
| Harry F. Shannon, Dixie Shannon | 53038 | 1950 | $8,456.68 |
| James A. Hedgecoke, Myrtie Maxine Hedgecoke | 53039 | 1950 | 8,456.70 |
| Hollis F. Atkinson, Sidney S. Atkinson | 53040 | 1950 | 8,406.60 |
| Jack B. Lankford, Jewel H. Lankford | 53041 | 1950 | 8,456.70 |
| R. D. Mills, Nona T. Mills | 53042 | 1950 | 4,113.20 |
| Estate of E. L. Morris, et al | 53043 | 1949 | 9,449.15 |
| Garland H. King (formerly Garland H. Morris) | 53044 | 1950 | 6,976.12 |

On October 12, 1956, petitioners in all of the above dockets, by amended petitions, struck out paragraph 3 of their original petitions

and substituted a new paragraph 3 claiming an overpayment in the amount of $765.10 for the taxable year 1950 as to all docket numbers except No. 53043, in which an overpayment in a like amount was claimed for 1949. The amended petition in Estate of E. L. Morris, deceased, and Garland H. Morris (now Garland H. King), Docket No. 53043, further struck out paragraphs 4 (c) and 5 (1) of the original petition and substituted new paragraphs 4 (c) and 5 (1), claiming a loss (in addition to her allocable share of an operating loss) in the amount of $29,932.30 for the year 1949. The amended petition of Garland H. King (formerly Garland H. Morris), in Docket No. 53044, further struck out paragraphs 4 (c) and 5 (m) of her original petition and substituted new paragraphs 4 (c) and 5 (m) claiming a loss of $29,932.30 for the year 1950.

The issues presented are: (1) Whether the conveyance of an undivided interest in certain ranch land and other lands to M M Cattle Co. during 1949 for cash and deferred annual payments over a 49-year period (the indebtedness for deferred payments being evidenced by a vendor's lien note) constituted a sale, a tax-free exchange, or a contribution of capital to the corporation; (2) whether the interest of the Hedgecoke Estate in said note was "distributed" to those of petitioners who were beneficiaries upon the final distribution of the Estate of Mattie Hedgecoke in the year 1950, so as to require a determination of accelerated gain under section 44 (d), I. R. C. 1939; (3) whether petitioner Garland H. Morris (now Garland H. King) was a bona fide partner in the business known as Tule Cattle Company; (4) whether petitioners in Docket No. 53043 were entitled to deduct for 1949 any allocable share of the operating loss of Tule Cattle Company; and (5) whether petitioners in Docket No. 53043, for 1949, or petitioner in Docket No. 53044, for 1950, were entitled to deduct an alleged loss on liquidation of Tule Cattle Company, or loss of investment in said company.

### FINDINGS OF FACT.

The facts are partly stipulated and to the extent so stipulated are incorporated herein by reference.

Petitioners Harry F. and Dixie H. Shannon, James A. and Myrtie Maxine Hedgecoke, Jack B. and Jewel H. Lankford, husbands and wives, all resided in Amarillo, Texas, during the year 1950.

Petitioners Hollis F. Atkinson, individually and as independent executor of the Estate of Mrs. Sidney S. Atkinson, deceased, E. L. Morris, deceased, and Garland H. Morris (now Garland H. King), husband and wife, prior to January 1, 1949, all resided in Amarillo, Texas.

Petitioners R. D. and Nona T. Mills are husband and wife, and during the year 1950 resided at Pampa, Texas.

Petitioners in Estate of E. L. Morris, deceased, and Garland H. Morris (now Garland H. King) filed a joint return for the year 1949. Garland H. King (formerly Garland H. Morris) filed an individual return for 1950. All returns of the remaining petitioners here involved were joint returns. All returns involved were filed with the then collector of internal revenue for the second district of Texas at Dallas, Texas.

Dixie H. Shannon, James A. Hedgecoke, Sidney S. Atkinson, deceased, Jewel H. Lankford, Nona T. Mills, and Garland H. Morris (now Garland H. King), are the 6 children of Mattie Hedgecoke (nee Whittenburg) and they are also 6 of the 19 grandchildren of J. A. Whittenburg.

J. A. Whittenburg and Tennie Whittenburg were husband and wife and resided in the State of Texas. Prior to 1936, J. A. Whittenburg and his wife were the owners of a 44,000-acre ranch situated in Texas, Oklahoma, and New Mexico. Under the community property laws of Texas, each of the two spouses owned an undivided one-half interest in the 44,000-acre ranch. Sometime prior to 1936, Tennie Whittenburg died and her undivided one-half interest in the ranch descended to her 2 children, George Whittenburg and Mattie Hedgecoke (*nee* Whittenburg). J. A. Whittenburg died in 1936, at which time he still had an undivided one-half interest in the aforementioned ranch, and in his will he left his interest in said property in trust to his 19 grandchildren, i. e., the 6 children of his daughter, Mattie Hedgecoke, and the 13 children of his son, George A. Whittenburg.

George Whittenburg also died sometime prior to 1936 and at the time of his death he willed his one-fourth interest in the ranch, which he had inherited from his mother, Tennie Whittenburg, to his 13 children. The share for his son Jake was devised in trust.

On August 26, 1941, Mattie Hedgecoke died and by her will devised her undivided one-fourth interest in the ranch (which she had inherited from her mother) in trust for her 6 children, the petitioners involved herein. Thus, from the will of Mattie Hedgecoke, each petitioner was the beneficiary of an equitable one-sixth interest in an undivided one-fourth interest in said ranch, or an undivided one twenty-fourth equitable interest therein; and from the will of their grandfather, J. A. Whittenburg, they each were entitled to an additional undivided one thirty-eighth equitable interest in the ranch.

The will of Mattie Hedgecoke provided in part as follows:

### IV.

1. I direct that upon my decease the trustee shall immediately succeed to the possession, control and management of the property of my estate, and shall continue in such possession, control and management until the duties herein stipulated shall have been performed. Upon my decease my estate shall be

divided into as many parts or portions as there shall be beneficiaries, and the part or portion allotted to each beneficiary shall be set apart to such beneficiary, shall be the separate property of such beneficiary, and a separate accounting thereof made and kept for such beneficiary. It shall not be necessary to make a physical partition of all of the properties where such partition would not be practical or would work to the disadvantage or detriment of the estates of such beneficiaries, but the undivided interest of all such properties as shall not be partitioned shall be allocated to and a separate accounting thereof made and kept for each of said beneficiaries, so that from the date of my decease, or from the earliest time at which the trustee can assume possession, control, and management of the property of my estate, the same shall be divided for accounting purposes into as many portion [sic] or shares as there shall be beneficiaries, to the end that the portion or share allotted to each beneficiary shall be the separate individual property of such beneficiary. *Each portion or share shall be a separate trust estate, and the trustee shall be the trustee for the beneficiary of such separate trust estate, to the same effect as if each separate share or trust had a separate and different trustee.*

2. No distribution of the property of my estate, except the income thereof, shall be made to any beneficiary until after the expiration of two years after my decease, except as may be herein otherwise stipulated. As soon after the expiration of two years after my decease as it can be done without sacrificing the interest of the beneficiaries, the trustee shall, upon demand of any beneficiary, who is 25 years of age, distribute to such demanding beneficiary, his share or portion of the property of my estate then distributable under the terms of this will; and thereafter as each beneficiary shall arrive at the age of 25 years, and upon demand, his portion or share of the property shall be delivered to him. *If any beneficiary should die after my decease and before his share of the property shall have been delivered to him, such share of such deceased beneficiary shall remain subject to the terms of the trust and shall be handled and distributed to the heirs at law of such beneficiary as though they had been beneficiaries at the time of my decease, except they shall be entitled to distribution of their shares as they reach the age of 21 years.*

3. *The trustee shall continue to act as trustee for each beneficiary, (even after such beneficiary shall be entitled to have his share) until such share has been distributed to him or until a demand in writing shall have been made and placed of record in the county where the property is located.*

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

V.

For the purpose of clothing the trustee with ample power and authority to effectively and efficiently discharge the trust, *I give and grant unto my said trustee full power and authority to manage and control the property of the trust estates, and to sell, exchange, and dispose of the same or any part thereof*, to execute, acknowledge and deliver any and every kind of contract, lease, deed, easement, or other instrument, conveying or leasing any real or personal property or mineral estate, and at such price and on such terms as to him may seem to be the best interest of the trust estates and the beneficiaries. * * * [Emphasis supplied.]

At the time of Mattie Hedgecoke's death, decedent's children, Nona T. Mills, Garland H. Baird (later known as Garland H. Morris and now known as Garland H. King), Sidney S. Atkinson, now deceased,

all were over 25 years of age. The birth dates of the remaining children of Mattie Hedgecoke are as follows:

| | |
|---|---|
| James Andrew Hedgecoke | Apr. 12, 1917 |
| Jewel H. Lankford | May 24, 1920 |
| Dixie Hedgecoke (later Dixie H. Smith, now Shannon) | Nov. 15, 1925 |

The equitable beneficiaries and the individuals owning outright interests in the land agreed unanimously that they would not partition the acreage. Some of them, however, resided outside of the State of Texas and difficulty was anticipated or encountered in carrying on business relating to the ranch lands, particularly in those instances where all owners were required to sign any document relating thereto. The interested parties unanimously consented to an arrangement to have the lands managed through the use of a corporation.

On October 7, 1948, the equitable beneficiaries under the Hedgecoke and Whittenburg wills and the 12 children of George Whittenburg (other than Jake Whittenburg) addressed written requests and demands as follows:

AMARILLO, TEXAS
*October 7th, 1948*

TO J. A. WHITTENBURG, JR., and ROY R. WHITTENBURG, as Trustees under the Will of J. A. Whittenburg, Deceased,
and

TO J. A. HEDGECOKE and V. LEE MATNEY, as Trustees under the Will of Mattie Hedgecoke, Deceased,
and

TO LILLIE FRANCES RATLIFF, NANNIE MAE WINDSOR, and S. B. WHITTENBURG, as Trustees under the Will of Geo. A. Whittenburg, Deceased.

WE, Nona Tennie Mills, Garland H. Morris, Sidney Atkinson, J. A. Hedgecoke, Jewel H. Lankford, and Dixie H. Smith, as first parties, and Lillie Frances Ratliff, Annie W. Walker, J. A. Whittenburg, Jr., Nannie Mae Windsor, Georgia Whittenburg Hawks, Roy R. Whittenburg, S. B. Whittenburg, Mattie Pearl Morris, Joe D. Whittenburg, Bonne W. Liston, Helen Whittenburg McCartt, and Tennessee Whittenburg Cline, as second parties, for purposes thoroughly discussed by and among all of us, deem it to be to the best interest of all of us and of *our estates held in trust for us,* that a Texas corporation be chartered in the manner exhibited by the blank application for charter attached hereto and made a part hereof for every purpose, and to that end, and for the purpose of implementing said corporation for the transaction of such business, we make requests and demands as follows:

## I.

First parties request the Trustees under the Will of J. A. Whittenburg, Deceased, to subscribe and pay for, for each of us, 468 shares of the corporate stock of said corporation, and *we request the Trustees under the Will of Mattie Hedgecoke, Deceased,* to subscribe and pay for, for each of us, 741 shares of the corporate stock of said corporation. Second parties request the Trustees under the Will of J. A. Whittenburg, Deceased, to subscribe and pay for, for each of

us and for Jake Whittenburg, 468 shares of the corporate stock of said corporation.

A. Second parties request the Trustees for Jake Whittenburg under the will of Geo. A. Whittenburg, Deceased, to subscribe and pay for, for Jake Whittenburg, 342 shares of the corporate stock of said corporation, with the understanding that the certificate of stock shall not be issued and delivered unless and until the undivided interest in the real estate herein below mentioned, held in guardianship for Jake Whittenburg, shall have been purchased by the Trustees and conveyed to the corporation. If such undivided interest so held in guardianship be not acquired by such Trustees and so conveyed over to said corporation within the period of three years from this date, then and in that event said corporate stock shall be cancelled and the purchase price thereof paid by said Trustees refunded to them.

If such Trustees will comply with the foregoing request, then each of second parties will subscribe and pay for, for each of us, 342 shares of the corporate stock of said corporation.

The total of said subscriptions will constitute the total capitalization of said corporation as exhibited by said application. The certificates of stock so subscribed for each of first parties and second parties shall be issued to and delivered to each of them separately.

B. Each of the parties hereto respectfully demand of the Trustees under the Will of J. A. Whittenburg, Deceased, that when said corporation shall have been so chartered, such Trustees proceed to convey to said corporation their undivided interest and the interest of Jake Whittenburg so held in trust in the surface of all real estate left to them and to Jake Whittenburg by the Will of J. A. Whittenburg, Deceased; and *first parties respectfully demand of their Trustees under the Will of Mattie Hedgecoke, Deceased,* that they join in said deed, thereby conveying all of first parties' undivided interest in the surface of said real estate; and second parties hereby agree to join all such Trustees in such deed, thereby conveying their undivided interest in said real estate not so held in trust. [Emphasis supplied.]

On February 5, 1949, the addressees of the foregoing requests and demands gave their approval thereto.

On February 9, 1949, the charter of the M M Cattle Co. was granted for a term of 50 years with an authorized capital stock of $177,840, divided into 17,784 shares, each with a par value of $10 per share.

Pursuant to a stock subscription executed February 5, 1949, the stock of M M Cattle Co. was issued on March 10, 1949, as follows:

| Stock certificate No. | Issued to | No. of shares |
| --- | --- | --- |
| 1 | Trustees under the will of J. A. Whittenburg, deceased | 8,892 |
| 2 | Trustees under the will of Mattie Hedgecoke, deceased | 4,446 |
| 3 | Trustees for Jake Whittenburg under the will of George A. Whittenburg, deceased. | 342 |
| 4–15 | To 12 individual children of George A. Whittenburg, 342 shares each. | 4,104 |
| Total shares issued | | 17,784 |

The stock certificates of the M M Cattle Co. issued to the trustees under the will of Mattie Hedgecoke were not transferred to petitioner

beneficiaries during the taxable years 1949 and 1950. On December 21, 1950, stock certificate No. 1, above, for 8,892 shares was canceled and the stock represented thereby was reissued to the 18 grandchildren of J. A. Whittenburg, other than Jake Whittenburg whose shares were issued to trustees. 468 shares were issued to each of the 18 grandchildren, and a like number to the trustees for Jake Whittenburg.

On February 21, 1949, the executors and trustees of the estates of J. A. Whittenburg and Mattie Hedgecoke, pursuant to the requests and demands given to them in the writing dated October 7, 1948, set forth above, together with the 12 children of George Whittenburg (other than Jake) and their respective spouses, where married, conveyed the 44,000-acre ranch in Texas to M M Cattle Co. by a "Warranty Deed with Vendor's Lien" which states in pertinent part as follows:

for and in consideration of the sum of Two Million Five Hundred Thousand Dollars ($2,500,000), to us in hand paid and secured to be paid by M M Cattle Co., a corporation, of Amarillo, Potter County, Texas, *Fifty Thousand Dollars ($50,000.00) of which consideration is paid in cash,* the receipt of which is hereby acknowledged, and the *remainder of said consideration to be paid in forty-nine (49) equal annual installments,* the first installment payable on or before one (1) year from date hereof, and one installment payable on or before each consecutive year thereafter, to and including 1997; *said installments evidenced by notes fully disclosing the payees and other terms of said deferred installments;* the release of such installments as paid and other provisions affecting same being incorporated in a separate agreement executed simultaneously herewith; *have granted, sold, and conveyed, and by these presents do hereby grant, sell, and convey unto the said M M Cattle Co.* an undivided 51/52 interest in and to the following described real estate:

*     *     *     *     *     *     *

But it is expressly agreed and stipulated that the Vendor's Lien is retained against the above described property, premises and improvements, until the above described notes and all interest thereon are fully paid according to their face and tenor, effect and reading, when this deed shall become absolute. [Emphasis supplied.]

Under even date therewith, lands in New Mexico and Oklahoma were likewise conveyed to M M Cattle Co. The consideration recited in the deed for the Texas lands was also in fact the consideration for the New Mexico and Oklahoma lands.

A payment of $50,000 on account of the purchase price was made in 1949 and a vendor's lien installment note in the amount of $2,450,000 was issued by the M M Cattle Co., payable to Jewel H. Lankford, Annie W. Walker, and Georgia Whittenburg Hawks, designated as trustees in an "Agreement and Power of Attorney" dated February 21, 1949, executed by the petitioner beneficiaries, the 12 children of George A. Whittenburg (other than Jake), and trustees under the respective wills of J. A. Whittenburg, Mattie Hedgecoke, and George A. Whittenburg, the latter being trustee for Jake. The agreement and power of attorney recites that the trustees made payees of the note

were "elected and appointed by a majority in interest of all of the owners of said real estate, which owners have the same interest in said note as they have in said real estate"; that the payees are called trustees for the sake of convenience; that they must act unanimously; and that they—

shall have full power and authority to receive and receipt for payment of said noted [sic] or any of them or any part thereof. They shall have full power and authority to distribute the proceeds from such note payments to those entitled to receive the same. They shall have full power and authority to execute and deliver releases authorized under said deed or under this instrument.

They shall have full power and authority to do any and every act and to execute and deliver any and every instrument, which shall be due to be performed or executed under the terms of said deed and mortgages and this instrument; and when authorized in writing by a majority in interest of the holders of said securities, they shall have full power and authority to do any other act and to execute and deliver any other instruments in connection with this sale transaction and the collection of said securities, which said written authority shall give to them.

Any one having an interest in said securities may sell and assign the same, but said securities shall, at all times, remain in the possession of said Trustees until they shall have been paid, and they shall be furnished with an original or duplicate original of each assinment [sic] and such other evidence of ownership as they may reasonably require.

\*    \*    \*    \*    \*    \*    \*

Said Trustees shall hold their appointment at the will of a majority in interest of the owners of said securities. When a vacancy in said Trustees occurs it shall be filled by a majority in interest. Should any one or more or all of said Trustees at any time resign or be removed, such vacancy or vacancies shall be filled by such majority in interest. Any joint owner of said securities who has reached the age of 18 years, or his representative, shall be entitled to represent his interest in the making of any decision herein contemplated. The certificate of the Trustees concerning the ownership of interest in the securities and the identity of the owners thereof, or other facts or absence of facts affecting titles, shall be binding and conclusive upon all of the undivided owners of said securities.

The powers herein granted to said Trustees shall be irrevocable, except that upon the demand in writing of a majority in interest, this instrument or any part, clause or provision thereof, may be changed or revoked, provided that no such change or revocation shall become effective as to an innocent purchaser until same is reduced to writing and filed for record in the county where the land involved lies; and the terms hereof and of any amendment shall bind our successors, heirs and assigns.

On February 21, 1949, M M Cattle Co. executed the following promissory note:

PROMISSORY VENDOR'S LIEN NOTE

$2,450,000.00            Amarillo, Texas            February 21, 1949

For Value Received, M M Cattle Co., promises to pay to Jewel H. Lankford, Annie W. Walker, and Georgia Whittenburg Hawks, Trustees, or order, the sum of $2,450,000.00 at Amarillo National Bank in Amarillo, Potter County, Texas.

The principal of this note is payable in forty-nine (49) annual installments of $50,000.00 each, the first installment being due and payable on or before February 21, 1950 and one installment payable on or before the 21st day of each succeeding February thereafter until the whole sum is paid.

Each installment on this note shall bear no interest to maturity but shall bear interest after maturity at the rate of three per cent (3%) per annum.

This note is given in part payment for certain real estate situated in Texas, in Oklahoma, and in New Mexico, fully described in three (3) deeds, one for each state this day executed and delivered to the undersigned by J. A. Whittenburg, Jr., and Roy R. Whittenburg as executors and trustees of the Estate of J. A. Whittenburg, Deceased, et al, and to secure the payment of same, according to the tenor hereof, a vendor's lien is retained and is hereby acknowledged.

This note is given by the undersigned as *part of the purchase price* for said above mentioned real estate and it is understood and agreed that failure to pay this note, or any installment as herein promised, when due, shall, at the election of the holder of said note, mature said note, and it shall at once become due and payable and all liens on said real estate securing same shall become subject to foreclosure proceedings as the holder may elect.

And it is hereby agreed that if this note is placed in the hands of an attorney for collection or if collected by suit or through bankruptcy proceedings, the undersigned agrees to pay five per cent (5%) additional on the principal and interest then due hereon as attorneys fees. [Emphasis supplied.]

M M Cattle Co.

By————————————————

*Its President*

Attest ——————————

*Assistant Secretary*

On February 21, 1949, M M Cattle Co. issued its check in the amount of $49,038.47 to the trustees designated in the above promissory note for the cash payment referred to in the warranty deeds of even date. On April 29, 1949, said trustees issued their check in the sum of $12,500 to the Mattie Hedgecoke Estate designated "Distributive share of cash payment on land by M M Cattle Co."

On January 31, 1950, and on February 14, 1951, M M Cattle Co. issued checks in the respective amounts of $49,038.46 and $50,000 to the trustees named in the note for the installment payments set out in the promissory note of February 21, 1949. On February 1, 1950, and February 19, 1951, respectively, the trustees named in said note issued their checks in the amount of $12,500, one to the Mattie Hedgecoke Estate, and the other to "Mattie Hedgecoke Properties" (as per power of attorney, dated December 31, 1950).

The Estate of Mattie Hedgecoke had a one-fourth interest in the 44,000-acre ranch, and its proportionate interest in the sale price thereof was $625,000 payable over a 50-year period at $12,500 per year. In its Federal fiduciary income tax return for the calendar year 1949, the Estate of Mattie Hedgecoke reported the cost or other basis of the one-fourth interest in the ranch to the estate as $65,783.55.

On December 31, 1950, an instrument of distribution was executed by J. A. Hedgecoke, sole remaining trustee under the will of Mattie Hedgecoke, distributing all of the assets of the trusts under said will to the petitioners "*in solido* without affecting [*sic*] any partition or any distribution separately to each." At this time the petitioners received, among other things, an undivided one-fourth interest in the aforementioned promissory note in the face amount of $2,450,000, which had been reduced to $2,400,000 by the payment already made to the Estate of Mattie Hedgecoke.

On December 31, 1950, five of the petitioners who were beneficiaries under the will of Mattie Hedgecoke gave James Andrew Hedgecoke, the sixth petitioner beneficiary, their power of attorney to manage and otherwise handle their interests in the properties and other assets distributed to them by said Hedgecoke as sole remaining trustee under the will of Mattie Hedgecoke, with the right of the said Hedgecoke, under the terms of the said power of attorney, to execute any and all instruments under the assumed name "Mattie Hedgecoke Properties."

When the incorporation of M M Cattle Co. was first planned to take over the ranch and other lands thereafter conveyed to it, there was no discussion concerning the execution of a promissory note by the corporation.

In establishing the amount of the note which was to be given by the M M Cattle Co. to the incorporators, the incorporators estimated that the corporation would earn $50,000 per year during its corporate existence from the lands transferred to it and concluded that the corporation should pay the sum of $50,000 per year for 50 years or a total amount of $2,500,000, of which $2,450,000 was to be represented by the note.

The face value of the petitioners' interest in the above note (distributed to them on December 31, 1950) was $600,000 at the time of distribution. The respondent determined that the fair market value of their interest in said note was $202,960.61.

The Estate of Mattie Hedgecoke, in its return for 1949, elected to report gain arising from the disposition of its one-fourth interest in the Texas, Oklahoma, and New Mexico properties on the installment basis. The said estate likewise reported gain therefrom on the installment basis in its return for 1950.

The transaction in 1949 by which the Texas, Oklahoma, and New Mexico properties were conveyed to M M Cattle Co. for a consideration of $2,500,000 (of which $50,000 was paid on account at the time of the conveyance, and the balance, evidenced by an installment note with vendor's lien retained, was payable in equal annual payments of $50,000 each) was a sale and not an exchange.

On June 10, 1948, petitioner Garland H. King (then Garland H. Morris) entered into a written agreement, referred to as an operating

agreement, with V. Lee Matney to engage in buying, selling, raising, and running livestock, and leasing livestock ranges for such activities. Said agreement provides as follows:

OPERATING AGREEMENT

THE STATE OF TEXAS

COUNTY OF POTTER

THIS AGREEMENT is entered into by and between Garland Morris, joined herein by her husband, E. L. Morris, herein called first party, and V. Lee Matney, herein called second party:

WITNESSETH:

1. The parties hereto have sold the Tule Ranch, and have and by these presents do dissolve and terminate the operating agreement executed by them under date of October 30, 1944.

2. The parties hereto have entered into and have organized a livestock raising and trading company, the purposes and manner of operation of which are as stipulated in the following paragraphs hereof:

3. The trade name for the operations shall be "Tule Cattle Company".

4. The purposes of the enterprise shall be buying, selling and raising and running livestock, and leasing livestock ranges for such activities.

5. The term for which this operation agreement shall continue is 10 years, beginning with the date of this agreement, and as long thereafter as the parties may agree in writing to continue the same; provided however, that the death of either party shall terminate this operating agreement, and its affairs shall be wound up and closed as soon thereafter as can be done without sacrificing or jeopardizing the investments in said enterprise.

6. The enterprise shall be capitalized and financed as follows; each party hereto shall, simultaneously with the execution of this operating agreement, subscribe and pay into the treasury of the company the sum of $25,000.00, making a total of $50,000.00 as its capital fund. First party shall pay into the treasury of the company an additional sum of $50,000.00 which shall be used by the company as an operating fund, for the term of the operating agreement, and for which there shall be no interest charged or paid, but said fund shall be a loan by first party to the company for the term of the operating agreement, and be repaid at the termination of the operating agreement, but without interest. Any additional operating funds required shall be borrowed by the company.

7. During the term of this operating agreement, second party shall be the sole and the exclusive manager of the company and of its operations, shall be charged with the duty of buying and selling and handling livestock, purchasing leases for livestock ranges, and he shall also act as treasurer for said enterprise charged with the duty of collecting, depositing, and disbursing funds, which funds shall be deposited and carried in the name of "Tule Cattle Company", subject to be disbursed on the signature of second party. The company shall pay all reasonable expenses incurred by second party in the operations of the enterprise, but he shall receive no compensation by way of salary for his services to said company. First party shall have no duties to perform in connection with the operations of the company.

8. The parties hereto shall share equally in the profit and losses of the enterprise, and as often as annually, on demand of either party, dividends shall be declared and paid from any undistributed available profits or surplus.

EXECUTED THIS 10th day of June, 1948.

In June 1948, petitioner Garland H. King (then Garland H. Morris) delivered her checks in the amount of $25,000 and $50,000, respectively, to the Tule Cattle Company. In addition, said petitioner invested in said company the balance of her capital account in a prior business known as Tule Ranch Company, consisting of book assets in the amount of $27,896.88. Included in these book assets were the following 6 accounts receivable:

| Debtor | Amount |
|---|---|
| Sam Elliott | $69.23 |
| V. B. Elliott | 2,000.00 |
| Hugh Ford | 2,125.00 |
| Harold Hughes | 1,310.99 |
| J. Shelby Jersig | 13,960.55 |
| Charlie Spencer | 2,300.00 |

The foregoing accounts were from 1 to 3 years old at the time of the transfer, and the proceeds arising from subsequent collection of these accounts by the Tule Cattle Company was $5,757.90.

Profits (or losses) of the Tule Cattle Company for the period June 10, 1948, to September 30, 1950, were as follows:

| Year | Amount |
|---|---|
| June 30 to Dec. 31, 1948 | ($108,294.10) |
| Jan. 1 to Dec. 31, 1949 | (36,112.57) |
| Jan. 1 to Sept. 30, 1950 | 502.31 |
| Total | (143,904.36) |

In her income tax return for 1948, petitioner Garland H. Morris (now Garland H. King) claimed as a deduction a loss of $54,147.05 as her allocable share of the total operating loss of Tule Cattle Company for the taxable year. This loss was allowed.

On Schedule E (income from partnerships, etc.) of the joint Federal income tax return for 1949 of Garland H. Morris and her then husband, there was claimed as a deduction the amount of $18,056.28 which was one-half of the loss sustained by the company for that year. Respondent disallowed the deduction.

On April 13, 1949, Garland H. Morris, joined by her then husband, E. L. Morris, entered into a liquidating agreement with Matney for the dissolution of the "partnership firm of Tule Cattle Company," which was to be completed by June 30, 1949.

On September 30, 1950, the Tule Cattle Company had assets of the total book value of $32,178.19 and its total liabilities per books (other than capital) were $76,975.02.

During the existence of Tule Cattle Company, the only assets which Garland H. Morris received from the company were certain horses having a value of $761.25.

On Schedule G (income from partnerships, etc.), of her Federal tax return for the year 1950, Garland H. Morris claimed the amount of $26,932.30 as a partnership loss from the Tule Cattle Company. By amendment of the joint petition of Garland H. Morris and the estate of her deceased husband, the same loss was claimed for 1949.

In 1950, Garland H. Morris brought an action in the Texas courts against Matney requesting an accounting of the Tule Cattle Company and recovery of her investment therein. In the lower court, she alleged, *inter alia*, that she was a married woman when she entered into the operating agreement with Matney dated June 10, 1948, and that, by reason of her coverture, she lacked authority and power to become a party in a trading partnership. She further alleged that by reason of her investments of her separate money in the Tule Cattle Company she became a "creditor" of the company to the extent of her total investments, for which amount she sought judgment. She was denied relief and appealed. The decision of the Court of Civil Appeals of Texas, reported as *King* v. *Matney*, 259 S. W. 2d 606, held that she had not had her "disability of coverture" as a married woman in Texas removed prior to her attempt to enter into a partnership with Matney and that, therefore, she could not be a partner in Texas.

The court concluded that "all of her investments should be returned to her as a creditor and not as a partner." Judgment was rendered for Garland H. King against V. Lee Matney and Tule Cattle Company, jointly and severally, for the total sum of $102,896.88, representing the entire amount of moneys advanced or invested by petitioner to Matney and the Tule Cattle Company, together with 6 per cent lawful interest thereon from June 29, 1953. The amount of her judgment was undiminished by any share of losses sustained by Tule Cattle Company in 1948 and 1949.

After said judgment was rendered in 1953, the present husband of Garland H. Morris (now Garland H. King) endeavored to collect the judgment. Records and banks were checked in counties where Matney did business to ascertain if he owned any assets therein, but nothing was ever found upon which levy could be made and nothing was ever realized upon the judgment.

Petitioner Garland H. Morris (now Garland H. King) did not sustain a loss growing out of the Tule Cattle Company enterprise in either 1949 or 1950.

OPINION.

*I.*

Respondent determined that the distribution on December 31, 1950, of an interest in an installment note to petitioners by the remaining trustee of the Estate of Mattie Hedgecoke caused a "disposition" of

such obligation within the purview of section 44 (d), I. R. C. 1939,[2] resulting in acceleration of taxable gain to petitioners in 1950. Respondent's determination is prima facie correct, and the burden of establishing error lies with petitioners.

Petitioners urge error in the foregoing determination. In addition, petitioners in Docket No. 53043 assign error in the taxation of gain arising out of the $50,000 downpayment made by M M Cattle Co. in 1949, and petitioners in all other dockets assign error in the taxation of gain arising out of the cash payment of $50,000 made on account in 1950 pursuant to the provisions of the installment note.

A. Petitioners' first contention is that the transaction in *1949* in which the one-fourth interest of the Mattie Hedgecoke Estate in the Texas, Oklahoma, and New Mexico properties, together with the remaining interests therein, were transferred to M M Cattle Co. for $50,000 in cash and an installment note of $2,450,000 was a tax-free exchange within the meaning of section 112 (b) (5). Since part of the consideration was cash, we infer that this argument assumes also the applicability of section 112 (c) (1).[3] Respondent argues in his

---

[2] SEC. 44. INSTALLMENT BASIS.

(d) GAIN OR LOSS UPON DISPOSITION OF INSTALLMENT OBLIGATIONS.—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and (1) in the case of satisfaction at other than face value or a sale or exchange—the amount realized, or (2) in case of a distribution, transmission, or disposition otherwise than by sale or exchange—the fair market value of the obligation at the time of such distribution, transmission, or disposition. Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received. The basis of the obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full. This subsection shall not apply to the transmission at death of installment obligations if there is filed with the Commissioner, at such time as he may by regulation prescribe, a bond in such amount and with such sureties as he may deem necessary, conditioned upon the return as income, by the person receiving any payment on such obligations, of the same proportion of such payment as would be returnable as income by the decedent if he had lived and had received such payment. * * *

[3] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(b) EXCHANGES SOLELY IN KIND.—

\* \* \* \* \* \* \*

(5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. Where the transferee assumes a liability of a transferor, or where the property of a transferor is transferred subject to a liability, then for the purpose only of determining whether the amount of stock or securities received by each of the transferors is in the proportion required by this paragraph, the amount of such liability (if under subsection (k) it is not to be considered as "other property or money") shall be considered as stock or securities received by such transferor.

\* \* \* \* \* \* \*

(c) GAIN FROM EXCHANGES NOT SOLELY IN KIND.—

(1) If an exchange would be within the provisions of subsection (b) * * * (5), * * * if it were not for the fact that the property received in exchange consists not only of

original brief that the 1949 transaction was a sale. In his supplemental brief, he takes the further position that it makes no difference with respect to the issues presented in the instant case whether the transaction be deemed a sale or a partially tax-free transfer under section 112 (b) (5) and (c) (1).

In our opinion, the 1949 transaction was a sale, as determined by respondent, or, in any event, that petitioners have failed to meet the burden of proving that it is to be treated otherwise. In the deed dated February 21, 1949, the language used was "do hereby grant, sell, and convey." A vendor's lien was retained. The installment note recited that it was given as "part of the purchase price." The Estate of Mattie Hedgecoke, in its fiduciary income tax return for 1949, referred to the transaction as an "installment sale" and reported gain arising therefrom on the installment basis in both the 1949 and 1950 returns. Petitioners' returns reflected their distributive interests in such gains in the same manner. It is clear that all of the parties in interest intended the transaction to be a sale, and the record refers to no contemporaneous action or expression of intent to the contrary. We think it is apparent that the contention that the transaction must be treated as other than a sale is an afterthought which stemmed from the emergence of the tax issue. See *Sun Properties* v. *United States*, 220 F. 2d 171 (C. A. 5, 1955).

Petitioners would, nevertheless, have us conclude that the transaction was an exchange within the meaning of section 112 (b) (5). (Petitioners do not refer to section 112 (c) (1) despite the downpayment of $50,000 in 1949. Reference will be made to this factor *infra*.) Petitioners offer, in support of their contention, the authorities which we now discuss. The first is *Le Tulle* v. *Scofield*, 308 U. S. 415 (1940). We think the case has no bearing on the problem before us. The transaction in *Le Tulle*, in which properties were transferred to a corporation for cash and bonds, was held to be a sale. The transferors received no stock and the Court held the transferors retained no substantial stake in the enterprise. The Court did not say that in all instances in which the transferors owned or acquired stock, a transfer of assets to the corporation must be deemed other than a sale even though the parties to the transaction fully intended it to be a sale.

Petitioners also rely upon *Camp Wolters Enterprises, Inc.* v. *Commissioner*, 230 F. 2d 555 (C. A. 5, 1956), certiorari denied 352 U. S. 826 (1956), affirming 22 T. C. 737 (1954), in which the court sustained the Commissioner's determination to the effect that the transaction was to be deemed a section 112 (b) (5) and (c) (1) exchange. In that

property permitted by such paragraph * * * to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.

case the facts were similar in some respects to those here presented, but the burden was on petitioner to establish that the transaction was other than a section 112 (b) (5) and (c) (1) transaction. There was no such convincing evidence as in the instant case that the transaction was in fact a sale. In this connection, two specific related distinctions in the facts may be mentioned. In the instant case, a vendor's lien was retained. No such lien was reserved in *Camp Wolters*. In *Camp Wolters*, it was agreed that no payment was to be made on the notes until a $325,000 bank loan had been fully repaid. There was no subordination of the obligation to the rights of other creditors in the instant case. Moreover, as suggested above in discussing *Le Tulle*, the court, in *Camp Wolters*, did not suggest that where the facts demonstrated a sale, it would nevertheless be necessary to transpose them into a section 112 (b) (5) and (c) (1) exchange. See *Sun Properties* v. *United States, supra.*

Finally, petitioners refer to *Houck* v. *Hinds*, 215 F. 2d 673 (C. A. 10, 1954). To this reference we add *R. M. Gunn*, 25 T. C. 424 (1955), affirmed per curiam 244 F. 2d 408 (C. A. 10, 1957), which involved a taxpayer who was a party to the same transaction as that considered in *Houck* v. *Hinds, supra.* In both of these cases, the facts were quite similar to those in the instant case. After careful comparison, however, we do not find the cases to be controlling here. The evidence of a sale (if it could be called a sale at all) was not as convincing as in the instant case. There was no downpayment and the transaction was more typically an exchange of assets for notes. In any event, in both *Houck* and *Gunn*, the Commissioner had determined the transaction to be a section 112 (b) (5) exchange (since there was no cash downpayment, section 112 (c) (1) was not involved) and the taxpayer faced the burden of proving otherwise. In the instant case, petitioners seek to disavow what purported to be a sale and the burden lies with them to prove error in respondent's determination by establishing that the 1949 transaction was other than a sale. We think petitioners have failed to meet their burden here just as the taxpayers in *Houck* and *Gunn, supra*, failed, in the light of the affirmative evidence, to establish a differing objective, namely, that the Commissioner had erred in determining that the particular transaction was an exchange within the meaning of section 112 (b) (5).

Although the issue is a mixed question of law and fact, it is predominantly one of fact. We do not think the opinions relied upon by petitioners require us to hold, upon the facts of the instant case, that the 1949 transaction was other than a sale. See *Warren H. Brown*, 27 T. C. 27 (1956).

Holding, as we do, on the basis of the foregoing discussion, that the transaction was a sale, it follows, for the same reasons, that it was not

an exchange within the meaning of section 112 (b) (5) and (c) (1), and it is unnecessary to elaborate our discussion to cover the question of whether or not the installment obligation might be deemed a "security" if the transaction were other than a sale. We wish to make it clear, however, that we are not to be understood as determining whether or not the result in the instant case would be different if the transaction were to be deemed a section 112 (b) (5) and (c) (1) transaction. We merely hold that it is unnecessary to consider the question, having held the transaction to be a sale. We point out, however, that petitioners argue that it was a tax-free exchange under section 112 (b) (5). They do not take into consideration the application of section 112 (c) (1) despite the fact that part of the consideration was in money. We think it obvious that on their own theory, there would have been recognition of gain at least with respect to the downpayment of $50,000 in 1949, since the express language of section 112 (c) (1) provides that where cash was part of the consideration, gain with respect to such payment "shall be recognized, but in an amount not in excess of the sum of such money * * *."

Since the Mattie Hedgecoke Estate, in its 1949 return, elected to account for gain on the installment basis, the problem would arise, even if this were a section 112 (b) (5) and (c) (1) transaction, as to whether, on the installment basis, any gain was to be recognized with respect to the $50,000 payment in 1950 in accordance with the provisions of section 44 (a) and (b). Gain was in fact reported on the installment basis in the estate's income tax return for 1950, which was deemed distributable to petitioner beneficiaries. Likewise, the question would arise as to whether the 1950 distribution by the estate to petitioner beneficiaries of their respective undivided interests in the note (to be discussed *infra*) required acceleration of gain under the provisions of section 44 (d) (which sets forth factors for determining the amount of any such accelerated gain) even though section 112 (b) (5) and (c) (1) were applicable, since the estate elected to report gain from the transaction on the installment basis.

Since we have held the transaction to be a sale, we find it unnecessary to discuss or determine the issues referred to in the preceding paragraph. We merely point out that petitioners' assertion that section 112 (b) (5) is applicable does not necessarily lead to the conclusion that no gain is to be recognized as arising from the $50,000 payment in 1950 or upon the distribution by the estate in 1950. It should be remembered, in this connection, that the issue relating to acceleration of gain arises out of the 1950 distribution and not out of the alleged tax-free exchange in which the properties were conveyed to the M M Cattle Co. in 1949.

We add, for completeness, that petitioners' brief, under the heading "Points Upon Which Petitioners Rely," raises no issue with respect

to the amounts of gain to be recognized or taken into account if gain is to be recognized at all. The points referred to (material to the 1949 transfer and the 1950 payment and distribution) deal only with the questions of whether the 1949 transfer was a tax-free exchange under section 112 (b) (5); whether, in the alternative, the installment obligation represented a capital contribution; and whether, again in the alternative, any event occurred in 1950 which would accelerate for tax purposes the unreported profit which petitioners might have in the installment obligation. The alternative issues are considered *infra*.

B. Petitioners' first alternative contention (relying on *Isidor Dobkin*, 15 T. C. 31 (1950), affirmed per curiam 192 F. 2d 392 (C. A. 2, 1951)) is to the effect that the corporation was inadequately capitalized and that therefore the installment note represented only a "receipt" for a capital contribution to the corporation. Accordingly, it is argued there could be no profit realized out of the transaction. Since we have held the 1949 transaction to be a sale, we have, in effect, ruled against this contention. We think it appropriate, however, to discuss the arguments advanced, although again it is clear that they represent an afterthought.

We think the instant case is clearly distinguishable from *Dobkin*. Here, petitioners, bearing the burden of proof, have failed to establish any intent to make a capital contribution. Moreover, the affirmative evidence supports the view that the installment note reflected or created a debtor-creditor relationship and was so intended. The cash in the amount of $177,840 paid in for stock appears to have provided ample capital for the conduct of the business of the corporation and, in any event, petitioners have not proved the contrary. In *Dobkin*, the facts are widely at variance with those here presented. There, taxpayer and his three associates organized a corporation to hold and manage a parcel of realty. Approximately $27,000 was required to finance the purchase, over and above outstanding first and second mortgages. The taxpayer and his associates each paid $7,000 of which $500 was arbitrarily designated capital stock and the remaining $6,500 was set up on the corporation's books as "Loans Payable." When additional working capital was required, the equality of investment was maintained by equal contributions. Taking into account the $44,000 of first and second mortgages, the effect of this designation was to give the corporation a debt structure of $70,000 as against a capital investment of $2,000. Significantly, the taxpayer testified that the division of his contribution into two portions, capital stock and a loan, was merely a bookkeeping transaction. We held that the entire amount paid in by the taxpayer was intended to be risk capital, noting that the paid-in capital was nominal in comparison to the capital necessary for the operations of the corporation which was furnished by the stockholders

in the form of a loan. We also pointed out that the notes were demand notes; that any attempt by the taxpayer or one of his associates to enforce payment would probably have rendered the corporation insolvent; and that there was no evidence that petitioner or any of his associates ever demanded repayment of their purported loans. In the instant case, the note was payable in equal installments, the first two of which, at least, were paid in due course (in addition to the original downpayment of $50,000). Further indicative of a debtor-creditor relationship here is the conventional provision in the note for attorney's fees in the event of collection through an attorney, or by suit, or through bankruptcy.

Upon consideration of all of the facts, we hold that the "thin corporation" theory is inapplicable in the instant case; that petitioners have failed to sustain the burden of proving that the note represented a capital contribution; and that the affirmative evidence leads to the conclusion that the note represented a debt. See *Sun Properties* v. *United States, supra; Warren H. Brown, supra.*

C. We likewise reject petitioners' further alternative argument that the installment note represented a capital contribution because the note served no "business purpose." Again the contention appears to be an afterthought. Concededly, one of the objectives of the incorporators was to devise a plan of operation which would dispense with the need of obtaining 19 or more signatures on documents required in the management of the ranch involved herein. In our view, however, the circumstances under consideration differ materially from those in *O'Neill* v. *Commissioner*, 170 F. 2d 596 (C. A. 2, 1948), affirming a Memorandum Opinion of this Court dated August 27, 1947, cited by petitioners to support their argument, where several wholly owned corporations were organized to hold real estate and deal therein in order to make it unnecessary for the taxpayer to procure his wife's signature for legal papers. We disregarded the corporate form and, for debtor and creditor purposes, treated as one the taxpayer who provided the advances and his corporations which did no recognizable business of their own. There, unlike the instant case, no stock certificates were actually issued by the corporation, no books or records were kept (except for copies of tax returns), and the corporation never gave the taxpayer a note or other evidence of indebtedness for any of his advances. Moreover, the Court was dealing with "business purpose" as applied to the corporation. Here there appears to be no foundation for any view that the M M Cattle Co. itself served no business purpose. The corporation in the instant case was obviously an economic entity distinct from the noteholders since it was actually engaged in raising cattle, and possession of the land was essential to its operations. Considering the nature of its activities, it is clear that the corporation was not in

any sense a sham. While one of the purposes of incorporation may have been to serve the personal convenience of the shareholders, as urged by petitioners, so long as that purpose was followed by the carrying on of actual business by the corporation, the corporation remained a separate taxable entity, and the rule is not altered by the mere fact that the transferors of the property owned all of the stock in the corporation. *Commissioner* v. *Moline Properties*, 131 F. 2d 388, 389 (C. A. 5, 1942), affd. 319 U. S. 436 (1943) ;*Skarda* v. *Commissioner*, 250 F. 2d 429 (C. A. 10, 1957), affirming 27 T. C. 137 (1956).

It is apparent from the record that all those directly or indirectly interested in the ranch property regarded the installment note and vendor's lien as evidence of the corporation's indebtedness, and that all of the participants treated the conveyance and arrangements incident thereto as a bona fide sale on their Federal tax returns. Having chosen to establish a debtor-creditor relationship, and having reported the profit from the transaction on the installment basis, neither those directly responsible nor those indirectly interested, but approving the course of conduct, may now, for tax reasons, successfully disavow the existence of the note or characterize the transaction as a capital contribution. In *Planters' Cotton Oil Co.* v. *Hopkins*, 53 F. 2d 825 (C. A. 5, 1931), affd. 286 U. S. 332 (1932), where the taxpayer likewise denied the substance of its legal status in order to obtain a tax advantage, the Court of Appeals said, in part (p. 827) : "Fraudulent pretense absent, the government accepts the taxpayer as it represents itself to be, and one may not, chameleon-like, change that appearance to suit his necessity or his convenience." See also *Commissioner* v. *Moline Properties, supra*.

D. Petitioners' final alternative argument asserts the view that no event occurred in 1950 which would accelerate for tax purposes any profit which the estate and, through it, petitioners might have in the installment obligation of M M Cattle Co. This raises the question of whether the distribution of the estate's interest in the note to petitioner beneficiaries in 1950 constituted a disposition within the purview of section 44 (d), *supra* footnote 2, resulting in acceleration of taxable gain during that year.

We think the law is well settled that when an installment obligation is distributed by an estate or trust to its beneficiaries, such obligation is "distributed, transmitted, * * * or otherwise disposed of" within the meaning of section 44 (d). In *Estate of Henry H. Rogers*, 1 T. C. 629 (1943), affirmed sub nom. *In re Rogers Estate*, 143 F. 2d 695 (C. A. 2, 1944), certiorari denied 323 U. S. 780 (1944), the executors of the estate sold certain property to a corporation, receiving serial notes as part of the consideration. A portion of the notes were thereafter distributed by the executors to themselves as residu-

ary trustees. We held that the sale was an installment sale, and that the distribution by the executors to themselves as trustees accelerated taxation of the gain represented by these notes under section 44 (d) of the Revenue Act of 1936. We said, in part (pp. 634, 635):

Respondent contends upon these facts that during the tax year 1937 petitioners "distributed, transmitted, sold or otherwise disposed of" installment obligations in the amount of $1,500,000, and that the proportionate part of the gain deferred upon the installment sale was required by section 44 (d) to be reported by the estate. In this we think he is correct. The word "distribution" appearing in subdivision (d) must be accorded its ordinary meaning; and the act of transferring property by an executor to a residuary trustee is in ordinary parlance known as distribution of the estate. * * *

In affirming us, the Court of Appeals said, in part (143 F. 2d at p. 696):

1. The Tax Court held, and the taxpayers and the Commissioner now agree, that the sale was an installment sale within the meaning of § 44 (b) of the Revenue Act of 1936, 26 U. S. C. A. Int. Rev. Code, § 44 (b). We think that the Tax Court correctly held that the subsequent transfers by the executors of the installment obligations to various trusts of which the executors were themselves trustees and to an escrow agent for a residuary legatee, were within the provisions of § 44 (d), "distributed, transmitted, sold, or otherwise disposed of." Maguire v. Commissioner, 313 U. S. 1, 61 S. Ct. 789, 85 L. Ed. 1149; and Helvering v. Gambrill, 313 U. S. 11, 61 S. Ct. 795, 85 L. Ed. 1155, are most persuasive here, although in those cases the tax arose under § 113 (a)–5 of the 1928 Revenue Act, 26 U. S. C. A. Int. Rev. Acts, page 380. Taxpayers' contention that these transfers were transactions without real substance, because the installment obligations vested in the beneficiaries from the moment the obligations were acquired by the estate, is substantially the position taken by this court in its opinion in Commissioner v. Gambrill, 2 Cir., 112 F. 2d 530, which was reversed by the Supreme Court in Helvering v. Gambrill, supra. * * *

Respondent determined that distribution was made by the Estate of Mattie Hedgecoke to petitioner beneficiaries on December 31, 1950. Petitioners have the burden of proving error. It is our view that not only has no error been demonstrated, but that the affirmative facts support respondent's contention. The circumstances are somewhat complicated because of the various steps taken and agreements executed, and we think it desirable, therefore, to review the facts as briefly as may be consistent with understanding.

The will of Mattie Hedgecoke, who died on August 26, 1941, is set forth in toto in Exhibit 2–B and is incorporated in our findings by reference. Significant parts of it are also set forth *in extenso* in our findings, and need not be repeated here. We point out only that the word "trustee" is used interchangeably with trustees, executors, and executor, according to context; that the interests of petitioners here material were equitable, having been devised in trust; and that the trustees had full power, under the will, to sell the assets here in

question. No issue is raised herein with respect to the interest of petitioner beneficiaries in the same properties under the will of J. A. Whittenburg, and we need discuss this factor no more than to say that it appears to have no effect upon the issues before us.

Under date of October 7, 1948, petitioner beneficiaries (joining with beneficiaries of the Whittenburg Estate) signed a document requesting that the trustees subscribe and pay for, for each of them, 741 shares of stock of a Texas corporation to be formed, and demanded that the trustees join with the trustees under the Whittenburg will in conveying the lands here involved to the corporation to be formed. The document recognizes that the properties in question are held in trust. The corporation was formed under the name of M M Cattle Co. The trustees under the will of Mattie Hedgecoke subscribed to 4,446 shares of the stock, which were issued in the names of the trustees and not in the names of petitioner beneficiaries.

On February 21, 1949, the properties were deeded (with vendor's lien reserved) to M M Cattle Co. in consideration of the sum of $2,500,-000, of which $50,000 was paid in cash, the remainder to be in 49 equal annual installments. The deeds were executed by the "executors and trustees" of the Mattie Hedgecoke Estate (together with the fiduciaries of the Whittenburg Estate and certain beneficiaries thereof) but was not executed by petitioner beneficiaries, who were not named as parties to the deeds. (The deeds were incorporated in our findings by reference, being Exhibits 5–E, 6–F, and 7–G.)

The installment note in the amount of $2,450,000 was issued payable to three trustees, none of whom was an executor or trustee of the Mattie Hedgecoke Estate. This was done pursuant to "Agreement and Power of Attorney," dated February 21, 1949. (Exhibit 8–H, incorporated by reference in our findings and set forth in part therein.) The agreement and power of attorney was executed by the trustees under the Whittenburg will, the trustees under the Mattie Hedgecoke will, petitioner beneficiaries, and beneficiaries of the Whittenburg will. No distribution was either effected or reflected. Authority was given to the three trustees named in the power of attorney to distribute payments arising from the installment note "to those entitled to receive the same." It also recites that the owners of the real estate in question "have the same interest in said note as they have in said real estate." The amount of $12,500, being a one-fourth share of the 1949 downpayment of $50,000, and a like share of the 1950 payment of $50,000 were paid over by the trustees under the power of attorney to Mattie Hedgecoke Estate, and not to petitioner beneficiaries.

The first and final distribution of assets by the Mattie Hedgecoke Estate, as disclosed by the record, is set forth in Exhibit 20–T (included in our findings by reference) headed "Final Distribution of

Mattie Hedgecoke Estate Properties," by virtue of which J. A. Hedgecoke, sole remaining trustee of the trust created by the will of Mattie Hedgecoke, on December 31, 1950, assigned, transferred, and distributed all of the assets of the trust in equal shares to petitioner beneficiaries. The distribution included the undivided one-fourth interest of the estate in the installment note issued by M M Cattle Co. It was intended that the distribution be in solido, without effecting any partition or separate distribution.

Whether under Texas law, on the death of Mattie Hedgecoke, her interest in the properties in question vested in the trustees under her will or in her executors is not here significant. It is clear that such interest did not vest in petitioner beneficiaries, and that, up to the time of the 1950 distribution, it vested in either the executors or the trustees, who were the same individuals. There is no evidence of a formal distribution from the executors to the trustees but it would appear that such a distribution was unnecessary, and that the interests in the property, and later in the note, vested in the trustees. In either event, there was no distribution to petitioner beneficiaries at any time from the date of death of Mattie Hedgecoke until December 31, 1950. More particularly, it is clear that the Hedgecoke interest in the installment obligation did not vest in petitioner beneficiaries at the time of its execution, or at any time thereafter until December 31, 1950, when distribution to them was made. Until that time, the interest of petitioner beneficiaries was equitable only.

We conclude, on the basis of the foregoing discussion, that the distribution of December 31, 1950, was a distribution within the meaning of section 44 (d) requiring acceleration of gain on the installment obligation as of that date. See Estate of Henry H. Rogers, supra.

We note petitioners' query: "Does the statute apply to an undivided interest in an installment obligation?" We think the answer is clearly in the affirmative. The statute accelerates gain on distribution, and there is nothing to limit its application to a distribution of the entire note. The obvious opportunities for avoidance which would arise from any other view require the construction that a distribution of an interest in the note is sufficient to accelerate gain on that interest. Petitioners suggest neither reasons nor authorities to support a negative answer to their query.

For completeness, we refer to the allegation in each of the petitions, except that in Docket No. 53043, reading as follows: "In the alternative, petitioners allege that after said note was executed, and in the year 1950, said note did not have a value in excess of petitioners' basis therein." The issue was not argued on brief, or referred to therein under "Points Upon Which Petitioners Rely."

Section 44 (d) provides in part as follows: "The basis of the obligation shall be the excess of the face value of the obligation over an

amount equal to the income which would be returnable were the obligation satisfied in full." Respondent determined (a) that the fair market value of the Hedgecoke one-fourth interests in the installment obligation to be $264,939.13 on December 31, 1950; (b) that the face value of the interest in the note was $600,000; (c) that the excess of face value of the interest over income returnable if satisfied in full was $61,978.52; and (d) that the gain under section 44 (d) was therefore $202,960.61.

It is clear that unless there was error in said determination (which is prima facie correct) that the fair market value was in excess of basis to the extent above set forth. No reference is made by petitioners to any factor in the calculation except fair market value. The only evidence in the record as to fair market value is that of James A. Hedgecoke, who "guessed" that the fair market value of the land, and of the note, was around $750,000, which would be $187,500 for the Hedgecoke, one-fourth interest. The testimony of the witness as to value was vague, and there is nothing to suggest that he had any expert knowledge. (Even his valuation was about three times the amount of basis.) We hold that his testimony is clearly insufficient to support the burden of proof of error in respondent's determination of fair market value, and respondent is accordingly sustained.

## II.

Petitioners in Docket No. 53043 assign as error respondent's disallowance of a deduction taken on their joint return for 1949 in the amount of $18,056.28 which was one-half of the operating loss of Tule Cattle Company for 1949. They claim the loss on the theory that Garland H. Morris (now Garland H. King) was a partner in said company sharing gains and losses equally with V. Lee Matney.

In order to be consistent with the use of her name in the case of *King* v. *Matney*, 259 S. W. 2d 606 (which, as will appear *infra*, bears on the issue), the former Garland H. Morris, one of the petitioners, will be referred to by her present name of King.

The operating agreement of June 10, 1948, relied upon by King in the instant case as establishing the partnership with herself and Matney as partners, is set forth in full in our Findings of Fact and need not be repeated here.

We take judicial notice of *King* v. *Matney*, *supra*, from which we glean the following.

King, by amended petition, alleged first that she was a married woman when she entered into the agreement of June 10, 1948; that by reason of her coverture, she lacked authority and power to become a party to the alleged trading partnership; and that by reason of the

investment of the sums of $75,000 and $27,896.88 of her separate money and estate in the Tule Cattle Company, she became a creditor of the company to the extent of her total investments. Secondly and alternatively, she pleaded her investments and sought an accounting and a dissolution of the alleged partnership.

The Court of Civil Appeals of Texas filed its opinion in the above case on June 1, 1953, and denied a rehearing on June 29, 1953. The court said, in part (259 S. W. 2d at p. 608) :

> The rule has long been well recognized that a co-partner in a mercantile enterprise is a merchant and must possess the elements of competency of a trader. The courts of Texas have for many years held that a wife cannot become a partner in business either with her husband or with another, since the legal difficulties are identical in both instances. Neither can she, joined by her husband, become a partner with a third person. The partnership of a single woman is terminated with her marriage, whether her husband or a third person be the other party. She has by her marriage incapacitated herself to perform the partnership contract. 23 Tex. Jur. 305, Sec. 267, and authorities there cited.

Later, at page 611, the court added the following:

> In any event, appellant is entitled to judgment for the $50,000 she advanced that was to be repaid to her when the contract terminated. A reasonable construction of the contract requires a return to her when the contract terminated the sum of $27,896.88 loaned to the Company by her for operating purposes. But under the record and authorities cited, it is *our opinion that all of her investments should be returned to her as a creditor and not as a partner.*
>
> \* \* \* \* \* \* \*
>
> For the reasons stated the judgment of the trial court is reversed and judgment is here rendered for appellant Garland H. King, *as a creditor*, against appellee, V. Lee Matney and Tule Cattle Company, jointly and severally, for the total sum of $102,896.88, representing monies advanced by appellant to appellee and the Tule Cattle Company as previously herein stated, together with 6% lawful interest thereon from this date. \* \* \* [Emphasis supplied.]

The court also (p. 610) adverted to the fact that the Texas rule is recognized by the Federal courts, citing *Kasch* v. *Commissioner*, 63 F. 2d 466 (C. A. 5, 1933), affirming 25 B. T. A. 284 (1932), certiorari denied 290 U. S. 644 (1933). In *Kasch, supra,* the Court of Appeals said, in part (p. 468) :

> For two or more persons to be partners they must expressly or impliedly agree to be associated in a relationship which has the legal effect of making them partners. White v. McNeil (Tex. Civ. App.) 294 S. W. 928; 20 R. C. L. 802. Under the Texas law, a married woman cannot be a partner in a mercantile business, unless her disabilities of coverture are removed by compliance with a statutory requirement. \* \* \* The only evidence as to an agreement on the subject of a partnership was as to an oral agreement between Ed Kasch, his wife, and Milton Kasch, with reference to a partnership of which each of the three was to be a member. It seems that such a partnership did not come into existence because of the incapacity of the wife to become a partner. \* \* \*

Petitioners urge us to hold that a partnership existed under the Federal revenue laws upon the authority of *Willis B. Anderson*, 6 T. C. 956 (1946), and like cases in which we have referred to the fact that the Internal Revenue Code contains its own definition of a partnership (see sec. 3797 (a) (2)) and that if in fact a bona fide partnership existed thereunder, it will be recognized despite provisions of State law to the contrary. In the instant case we may say preliminarily that we do not think petitioners have established the fact that a bona fide partnership did exist. We cannot assume that King did not intend to be governed by the laws of the State which had jurisdiction over her actions. At the same time, she must be presumed to have known the applicable laws and, accordingly, to have realized (to paraphrase *Kasch, supra*), that the "partnership [would] not come into existence because of [her] incapacity * * * to become a partner." In any event, the burden rested with her to prove that she was a bona fide partner of a bona fide partnership, which burden she has failed to meet.

There are other factors in the instant case, however, which make it unnecessary for us to further elaborate our views as to whether Tule Cattle Company was a bona fide partnership and King a bona fide partner therein. In *Willis B. Anderson, supra*, and the authorities referred to therein, we did not have before us a situation such as here presented where a State court, in an adversary proceeding, finally adjudicated the ultimate rights of the parties *inter sese*. In *King v. Matney, supra*, the Court of Civil Appeals of Texas *affirmatively* found that the relationship of King and Matney was that of creditor and debtor. The judgment rendered in favor of King as a creditor was for the *full amount* of her advances to or investments in Tule Cattle Company *without reduction* for any losses attributable to the operations of the company. In effect, the court's construction of the contract eliminated any sharing of losses (or profits, a small amount of which were earned in 1950). The significant result was that King was relieved of responsibility for, and in the year in question did not suffer from, the operating loss of Tule Cattle Company as such. Since the rights and liabilities of the one party to the other were thus finally adjudicated on a creditor and debtor basis, there can be no allocation to the creditor of a part of an operating loss of the company in which loss, under the decision of the Texas court, she did not share. See *Gallagher v. Smith*, 223 F. 2d 218 (C. A. 3, 1955); *Blair v. Commissioner*, 300 U. S. 5 (1937); *Freuler v. Helvering*, 291 U. S. 35 (1934).

We add, for completeness, that there is no basis for the deduction in 1949 or 1950 of the debt due by Matney to King on the ground of

worthlessness. The existence of the debt was not adjudicated until 1953, and there is no evidence of efforts to collect or worthlessness prior to that year.

### III.

Petitioner Garland H. King, for 1950, and as joint petitioner with the estate of her former husband, for 1949, claims that, in addition to her asserted allocable portion of the operating loss of Tule Cattle Company discussed above under II, she is entitled to deduct $29,932.30 as a loss in one year or the other. The alleged loss is sometimes referred to by petitioner as a loss on liquidation of partnership (Tule Cattle Company), and sometimes as a loss of investment. For the reasons set forth below, we think no loss is allowable on either theory in either year.

The amount of the alleged loss is arrived at by adding King's "capital investment" ($52,896.88) to the amount lent by her to Tule Cattle Company ($50,000) and subtracting therefrom the amount of the respective losses which she claims were allocable to her in 1948 and 1949 ($54,147.05 and $18,056.28) and further subtracting $761.25, the value of horses distributed to her in 1949. Her claim of $29,932.30 is further reduced, in her proposed findings of fact, to $26,932.30 by deducting $3,000 as an "estimated amount of recovery on remaining assets." [4]

We think the issue is disposed of by what we have already said in disallowing the deduction of $18,056.28 as petitioner's asserted allocable portion of the 1949 operating loss. The decision in *King* v. *Matney, supra,* merged all of King's claims into an indebtedness by Matney and Tule Cattle Company to her. As already stated, there is no evidence that the claim against Matney was worthless in 1949 or 1950, and we may add that there is no claim (or evidence) of partial worthlessness in either of said years.

Assuming, *arguendo,* however (although we do not so hold), that the asserted loss on liquidation of partnership or loss of partnership investment was unaffected by the decision in *King* v. *Matney, supra,* our conclusion would be the same. There is no evidence in the record that all of the assets of Tule Cattle Company were liquidated in either 1949 or 1950. The book assets of the company were $32,178.19 as of September 30, 1950, and there is some evidence that at least a part of these assets was liquidated in years subsequent to 1950. In any event, there is no evidence of any taxable transaction or transactions which established any such loss on liquidation or loss of investment in 1949

---

[4] The amount of such estimate is referred to in hearsay testimony by an accountant. but is not substantiated as correct by any acceptable evidence.

or 1950. It is well settled that losses sought to be deducted for income tax purposes under section 23 (e) of the 1939 Code must be evidenced by completed transactions, fixed by identifiable events, and actually sustained during the taxable period for which allowance is claimed. *Commissioner* v. *Peterman*, 118 F. 2d 973 (C. A. 9, 1941), affirming a Memorandum Opinion of this Court dated November 27, 1939.

Moreover, on King's theory, Matney, as a partner, would have been indebted to her on his obligation to share one-half of the losses. The amount of such indebtedness (other than as determined in *King* v. *Matney, supra*) is not suggested, and could not be determined while assets remained unliquidated. Assuming the existence of such a debt, there is no evidence of total or partial worthlessness in 1949 or 1950.

We hold, therefore, that the claimed deduction for loss on liquidation or loss of investment is not allowable for 1949 or 1950.

*Decisions will be entered under Rule 50.*