ESTATE OF HENRY H. ROGERS, DECEASED, ALBERT STICKNEY AND CENTRAL HANOVER BANK AND TRUST COMPANY, AS SURVIVING EXECUTORS OF THE LAST WILL AND TESTAMENT OF HENRY H. ROGERS, DECEASED, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 107817. Promulgated February 23, 1943.

*Theodore Pearson, Esq.*, for the petitioners.
*T. H. Lewis, Jr., Esq.*, for the respondent.

OPINION.

ARUNDELL, *Judge:* The Commissioner's determination that a sale was not reportable on the installment basis gave rise to the presently contested deficiency of $790,125.75 in income tax for 1937. If it is held that this determination was erroneous, the Commissioner by amended answer presents the alternative view that certain of the installment obligations were disposed of by petitioners during the tax year, the gain therefrom resulting in a deficiency though in a lesser amount than originally determined. Petitioners take the position that if gain did result from disposition of the obligations (1) a corresponding deduction is allowable under section 162 (c) of the Revenue Act of 1936, or (2) the percentage of gain to be taken into account in computing net income is 60 percent instead of 80 percent. The facts are found as stipulated. The return for the period involved was filed with the collector for the second district of New York.

Adrian H. Larkin, Albert Stickney, and the Central Hanover Bank & Trust Co. were appointed executors of and trustees under the last

will and testament of Henry H. Rogers, who died on July 25, 1935, a resident of Southampton, New York. They qualified as executors on October 28, 1935, and as trustees on November 14, 1935. This proceeding is maintained by the surviving executors in behalf of decedent's estate.

Among the assets constituting the estate were 24,248 shares of common stock of the Virginian Railway Co., hereinafter referred to as the railway company, which had a fair market value at the date of death of $60 per share, or an aggregate of $1,454,880. On July 15, 1936, the executors and various other holders of common stock of the railway company, hereinafter known as parties of the first part, entered into an agreement with the Koppers Co. The agreement was modified and extended on November 30, 1936, and it is this modified agreement with which we are here concerned. The Koppers Co., party of the second part, changed its name and assigned its rights under the contract, but nothing turns upon these facts and for convenience the word Koppers will be used to designate the party of the second part or its assignees.

By the terms of the agreement Koppers agreed to buy and the parties of the first part, owning together 236,000 shares of common stock of the railway company, agreed to sell 25 percent of such shares owned by each of the latter at $133.40 per share, or a total of $7,870,600 for 59,000 shares. Article fifth of the agreement granted Koppers an option until January 19, 1937, to purchase the remaining 75 percent of railway company's common stock at $132 per share, payable in cash. Article third, however, granted Koppers the further option to purchase from the parties of the first part all the stock of corporation X for a cash consideration of $7,870,600. In the event the latter option should be exercised the agreement to buy and sell 25 percent of railway company common stock was to be rescinded and canceled, and the parties of the first part bound themselves to organize the corporation X and to convey to it all their shares of railway company common stock in exchange for the stock of corporation X and 5 percent collateral trust notes in the amount of $23,364,000 to be issued by X. The collateral trust notes were to be secured by all the common stock of the railway company.

On January 18, 1937, Koppers exercised the option granted by article third. In compliance with the agreement the parties of the first part caused the organization of the corporation X under the name of "The Virginian Corporation." The closing of the agreement occurred on January 19, 1937, at the office of the Central Hanover Bank & Trust Co., at which all parties in interest were represented. The following consecutive steps took place on that date: the parties of the first part transferred 236,000 shares of railway company common stock to the

Virginian Corporation in exchange for all of the latter's stock and $23,364,000 face amount of collateral trust notes; and the Virginian Corporation stock was then transferred to Koppers, which paid the parties of the first part $7,870,600 in cash.

The executors, for their 24,248 shares of railway company common stock, received stock of the Virginian Corporation having a fair market value of $808,669.77, collateral trust notes of $2,400,000 principal amount, and $552 cash in lieu of a fractional note. They then received cash of $808,670.80 for the Virginian Corporation stock as their proper proportionate share of the cash payment by Koppers.

At all times material to this proceeding the collateral trust notes had a fair market value equal to their face amount. They were issued under a collateral trust indenture dated as of January 1, 1937, under the terms of which all the common stock of the railway company transferred to the Virginian Corporation was pledged with a trustee as security for the obligation of the Virginian Corporation under its notes. The notes were serial notes maturing at the rate of $72,000 on January 1 of each of the years 1940 to 1951, inclusive, and the balance of $1,537,000 on January 1, 1952. All of the costs of incorporating the Virginian Corporation and issuing the serial notes were paid by Koppers; and since its organization the Virginian Corporation has not engaged in any activities of importance other than those required or contemplated by article third of the agreement of November 30, 1936, and the trust indenture.

In the income tax return filed on the cash basis in behalf of decedent's estate for 1937, an election was made to treat the above sale as an installment sale and to report the gain upon the installment basis. The gain reported was $442,366.49, which is that proportion of the cash payment actually received in 1937 ($809,222.80) which the gross profit realized or to be realized ($1,754,342.80) bore to the total contract price ($3,209,222.80), or 54.6656 percent. The percentage of the gain of $442,366.49 taken into account was 80 percent, or $353,893.19, inasmuch as the stock had been held for more than one year but less than two years. Respondent determined that 80 percent of the total profit should have been included in gross income.

The first question is whether the installment method of reporting the gain was available to petitioner. We think it apparent that the transaction falls squarely within section 44 (b) of the Revenue Act of 1936,[1] and that respondent erred in his determination to the contrary.

---

[1] SEC. 44. INSTALLMENT BASIS.

*     *     *     *     *     *     *

(b) SALES OF REALTY AND CASUAL SALE OF PERSONALTY.—In the case (1) of a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year), for a price exceeding $1,000, or (2) of a sale or other disposition of real property, if in either case the initial payments do not exceed 30 per centum of the selling

Petitioner sold personal property to the Virginian Corporation at a price exceeding $1,000 and received as the initial payment the latter's stock with a fair market value of $808,669.77, which is less than 30 percent of the total selling price of $3,209,222.80.

Respondent's argument is that the Virginian Corporation was nothing more than a "straw man" and that Koppers was the real purchaser. He asserts that the collateral trust notes issued by the Virginian Corporation did not evidence a debt of Koppers, the real purchaser, and consequently the notes were part of the initial payments under the definition of "payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made." The respondent recognizes on brief that, if Koppers is regarded as the real purchaser, consistency requires that Koppers also be considered as the issuer of the notes; but, even so, he contends that the notes do not evidence any indebtedness of Koppers. His argument ends with this observation: "But to speak of these Serial Notes as evidences of 'indebtedness' at all is very nearly a travesty, for, in substance, there was no debtor, merely a lien on the property sold."

The case principally relied upon to support his position is *Higgins* v. *Smith*, 308 U. S. 473, where the Court ruled that, inasmuch as complete control remained in an individual after his transfer of stock to a wholly owned corporation, "There is not enough of substance in such a sale finally to determine a loss." There is nothing in that case to aid respondent here, nor in other cases he cites [2] where corporations were treated as mere conduits or agents for the disposition of property. In the instant case there was substance to the sale to the Virginian Corporation. No suggestion is made that the form the transaction took was conceived as a tax saving or avoiding scheme. On the contrary, the organization of the Virginian Corporation and transfer of stock to it served a very real business purpose in relieving Koppers of personal liability for the balance due on the sale. Respondent himself recognizes this. Koppers did not acquire the railway company stock, and, while it did acquire control of the corporation to which that stock was sold, there is no warrant for ignoring what actually transpired.

Respondent's position is that the Virginian Corporation was a distinct and separate entity and yet there was no substance to the sale

---

price (or, in case the sale or other disposition was in a taxable year beginning prior to January 1, 1934, the percentage of the selling price prescribed in the law applicable to such year), the income may, under regulations prescribed by the Commissioner with the approval of the Secretary, be returned on the basis and in the manner above prescribed in this section. As used in this section the term "initial payments" means the payments received in cash or property other than evidences of indebtedness of the purchaser during the taxable period in which the sale or other disposition is made.

[2] *Carling Holding Co.*, 41 B. T. A. 493; *Abrams Sons' Realty Corporation*, 40 B. T. A. 653.

to it, since it did not acquire a beneficial interest in the property sold. The argument and its effects are hard to grasp. The tax sought to be imposed by the Commissioner is upon gain represented by the fair market value of the notes of the Virginian Corporation. Those notes had value only because they were secured by the property sold, for the Virginian Corporation had no other assets. It is thus clear that the Virginian Corporation had an interest in the stock of the railway company sufficient to give a value to its own notes of some $23,000,000. The argument that it acquired no beneficial interest in the stock is beside the point; it is like saying that no corporation has a beneficial interest in the property it owns because in final analysis all corporate property is held for the benefit of creditors and stockholders. Even in case of a sole stockholder the corporate transactions are ordinarily given their normal effect, and it is only where empty gestures without business purposes are indulged in for tax avoidance that a different rule applies. Such is not the case here.

We are of opinion that the sale was made to the Virginian Corporation and that the collateral trust notes, being evidences of the purchaser's indebtedness, were not part of the initial payments received on the sale.

This brings us to respondent's alternative contention, which is based upon the following facts:

Decedent's will, after making provision for certain legacies, left the rest and residue of his estate in trust with directions to the trustees to divide the same in three equal shares and pay the income therefrom to his widow, daughter, and grandson, respectively, during their lifetimes, with remainders over. In the event the widow remarried, one-half of the share held in trust for her was to be delivered free of trust to the issue of decedent and the widow. The widow remarried on April 30, 1937, and as a result the daughter for whom one of the shares was held in trust became entitled to receive one-half of the corpus of the widow's trust.

Following the receipt by the executors of the collateral trust notes on January 19, 1937, in the amount of $2,400,000, they were entered on the accounts of the estate as a part of its corpus and no change was noted in said accounts until November 6, 1937. On that date a portion of such notes in the principal amount of $1,250,000 was eliminated from the accounts of the estate, transferred in the personal trust department vaults of Central Hanover Bank & Trust Co. from an envelope marked "E 10966 Est. H. H. Rogers" to three envelopes which received different numbers and were marked residuary trusts under the will for the widow, daughter, and grandson, respectively, and entered on the accounts of the residuary trusts as part of their corpora. The principal amount of $500,000 notes was placed in each

of the accounts of the trusts for the daughter and grandson, and $250,000 in the widow's trust. The other half of the widow's share, $250,000 of notes, to which the daughter was entitled by reason of the former's remarriage, was eliminated from the accounts of the estate and held by the Central Hanover Bank & Trust Co. in escrow for the daughter in accordance with a receipt and refunding agreement whereby the interest on the notes was to be paid to the daughter as collected, but the notes or proceeds thereof were to be held and returned to the estate if the residuary estate should prove inadequate to pay all debts, claims, and expenses.

Accounts of the proceedings of the executors of decedent's estate covering the period material here were filed with the Surrogate's Court of the County of Suffolk, New York, and were duly confirmed and approved by orders of that court. A schedule attached to one of the accounts, entitled "Payments of Principal to or on Behalf of the Beneficiaries," recorded the payment of $1,250,000 of notes to trustees of the respective residuary trusts and of $250,000 of notes to the bank as escrow agent for the daughter.

The remaining $900,000 of notes were eliminated in 1939 from the accounts of the estate in a similar manner, of which $150,000 were thereafter held as escrow agent for the daughter and $750,000 were entered on the accounts of the residuary trusts in the proportions set forth above.

On the estate's income tax return for 1937 petitioners reported interest of $60,000 received on July 1, 1937, on the $2,400,000 face amount of notes; and on the return for 1938 they reported interest of $45,000 received during that year on $900,000 face amount of notes. Each of the residuary trusts filed returns for 1938, 1939, 1940, and 1941, and included on such returns interest upon the notes received by them. After November 6, 1937, and prior to December 31, 1941, some of the notes received by the three residuary trusts were sold by the respective trusts and others were redeemed and paid by the maker. On the returns filed by the trusts the amounts received from the sale or redemption of the notes were reported as gain derived from the payment of installment obligations, that is to say, 54.6656 percent of the amount received was reported as gain to be taken into account at a proper percentage in computing net income. None of the amounts so received from the sale or redemption of the notes was distributed to the life beneficiaries of the trusts. Neither petitioners, as executors of the estate, nor any of the trusts filed a bond as described and provided for in section 44 (d) of the Revenue Act of 1936.

Respondent contends upon these facts that during the tax year 1937 petitioners "distributed, transmitted, sold or otherwise disposed of" installment obligations in the amount of $1,500,000, and that the pro-

portionate part of the gain deferred upon the installment sale was required by section 44 (d)[3] to be reported by the estate. In this we think he is correct. The word "distribution" appearing in subdivision (d) must be accorded its ordinary meaning; and the act of transferring property by an executor to a residuary trustee is in ordinary parlance known as distribution of the estate. As the Supreme Court said in *Maguire* v. *Commissioner*, 313 U. S. 1, "'Distribution to the taxpayer' is not necessarily restricted to situations where property is delivered to the taxpayer. It also aptly describes the case where property is delivered by the executors to trustees in trust for the taxpayer." Residuary legatees, or trustees in their stead, take under and by virtue of the will, and it may also be that the present transfer was a "transmission," which is fairly taken "to mean devolution by will or by law." *Crane* v. *Helvering*, 76 Fed. (2d) 99.

Petitioner's contentions on this issue are not persuasive. The first is that under New York law if an executor who is also trustee does an act that would be proper if done by a trustee, but improper if done by an executor, it will be presumed that in so doing he acted as trustee. *Matter of McDowell*, 178 App. Div. 243; 164 N. Y. S. 1024. Without in any way questioning the soundness of that doctrine, there is nothing in the present case to show that it was not proper for the executors to make the sale and upon the terms they did. It may be that they needed the cash of $800,000 to pay debts or other legacies, in which event the sale no doubt was justified. The Surrogate's Court approved the executors' account which disclosed the fact and terms of the sale. The executors reported the sale for Federal income tax purposes as having been made by decedent's estate, and that is the way the transaction has consistently been treated.

The other argument is that section 44 (d) does not apply here because the basis of the notes in the hands of the trustees is the same as it was in the hands of the executors; consequently, the purpose of the statute, to prevent escape from taxation through a stepped-up basis, is satisfied in this situation without invoking subdivision (d). It is true that the subsection was adopted primarily for that purpose

---

[3] (d) GAIN OR LOSS UPON DISPOSITION OF INSTALLMENT OBLIGATIONS.—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and (1) in the case of satisfaction at other than face value or a sale or exchange—the amount realized, or (2) in case of a distribution, transmission, or disposition otherwise than by sale or exchange—the fair market value of the obligation at the time of such distribution, transmission, or disposition. Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received. The basis of the obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full. This subsection shall not apply to the transmission at death of installment obligations if there is filed with the Commissioner, at such time as he may by regulation prescribe, a bond in such amount and with such sureties as he may deem necessary, conditioned upon the return as income, by the person receiving any payment of such obligations, of the same proportion of such payment as would be returnable as income by the decedent if he had lived and had received such payment.

(House Report 2, p. 16; Senate Report 960, p. 24, 70th Cong., 1st sess.), but the section as enacted is not limited in terms to instances of a transferee acquiring a stepped-up basis. In fact the committee reports recognize that in the case of gifts the donee takes the donor's basis, and yet Congress did not see fit to write the subsection so as to exclude gifts from its operation. Taxation of the deferred gain realized upon an installment sale is accelerated by any distribution, transmission, or disposition of the installment obligations under subsection (d), and we think it would be unwarranted for us to write into the subsection the qualification urged by petitioners. The executors representing the estate, standing in the decedent's shoes, and the trustees representing the residuary legatees were two different taxable entities. When notes were transferred from one to the other there was literally a partial distribution of the residuary estate.

None of the decided cases, so far as we are aware, have applied subsection (d) to such a distribution as we have here, but the provision has been held applicable in analogous situations. The tax was accelerated by a transfer of obligations to a trust created by the taxpayer, of which she was to be the life income beneficiary, *Marshall* v. *United States*, 26 Fed. Supp. 580; by the transmission of obligations from a decedent to his estate by reason of his death, *Crane* v. *Helvering*, *supra; Mabelle M. Evarts*, 39 B. T. A. 861; and by the dissolution of a partnership caused by the death of one of the partners, *Waddell* v. *Commissioner*, 102 Fed. (2d) 503.

Furthermore, the argument that the trustees would take the executors' basis is of little assistance, for we are of opinion that basis to the executors would depend upon whether the gain upon the notes had been taxed or not. For example, if the full gain had been taxed at the time of the sale, subsequent collections on the notes would not be taxable, whether made by the executors or trustees. The same would appear to be true if the tax is accelerated in the executors' hands by the disposition and the application of section 44 (d).

Having concluded that the executors were required to report the deferred gain by reason of the distribution of the notes to the trustees, it becomes necessary to consider petitioners' alternative contentions. The first of these is that the estate is entitled to an offsetting deduction under section 162 (c),[4] upon the ground that the income so taxed to the estate was "properly paid or credited during such year" to the

---

[4] SEC. 162. NET INCOME.

*  *  *  *  *  *  *

(c) In the case of income received by estates of deceased persons during the period of administration or settlement of the estate, and in the case of income which, in the discretion of the fiduciary, may be either distributed to the beneficiary or accumulated, there shall be allowed as an additional deduction in computing the net income of the estate or trust the amount of the income of the estate or trust for its taxable year, which is properly paid or credited during such year to any legatee, heir, or beneficiary, but the amount so allowed as a deduction shall be included in computing the net income of the legatee, heir, or beneficiary.

residuary legatees. Petitioners urge that $546.65 of each $1,000 note represented capital gain and to that extent the distribution of each note was a proper payment of income, the balance being a distribution of corpus. This argument is made in the face of the facts that the distribution was designated by the executors as a payment of principal and the trustees did not include any part of the distribution in computing the net income for the tax year.

We can not accept petitioners' view. The identical question raised herein was decided against the taxpayer's similar argument in *Weigel* v. *Commissioner*, 96 Fed. (2d) 387, affirming 34 B. T. A. 237. See also *Old Colony Trust Co. et al., Executors*, 38 B. T. A. 828; *Anna M. Chambers*, 33 B. T. A. 1125; *Marie Minor Sanborn*, 33 B. T. A. 1120; affd., 88 Fed. (2d) 134; certiorari denied, 301 U. S. 700. Petitioners recognize this, but assert that the *Weigel* case was decided on a false premise and should not be followed. For reasons appearing below we think the case was correctly decided and is dispositive of the present issue.

Whether a distribution is of income or of corpus can not be left to depend upon what particular asset the executor happens to pick out for distribution. A particular dollar or piece of property has no inherent character as income or principal. The notes involved here became general assets of the estate upon their receipt. While petitioners' argument derives some color from the fact that for other purposes the notes may have had a basis lower than fair market value, that does not mean that they retained their character as part income and part corpus.

The basic question is not whether the asset distributed is traceable to income or corpus, but rather whether the payment was or should be marshaled against income on the one hand or principal on the other. The only practical means of determining that is by reference to the state law and the terms of the will. The Second Circuit has said: "The local law must decide whether a payment is part of 'the income of the estate * * * properly paid * * * to any legatee,' and in most cases the result will turn upon the language of the will." *Ardenghi* v. *Helvering*, 100 Fed. (2d) 406; certiorari denied, 307 U. S. 622. If the will authorizes the executor to distribute net income during the period of administration and the estate has net income during the tax year, a distribution will be deductible by the estate and taxable to the beneficiary although the actual dollars paid might be dollars which were owned by the testator when he died and were therefore corpus as to the estate.

The will under consideration is silent as to the distribution of income during administration of the estate, but petitioners are precluded in this case by article 23d, which contains the usual provision that "all realized appreciation in the value of stocks * * *, result-

ing from the sale or other disposition thereof, shall be considered principal and not income * * *." In addition to this, the local law of New York is conclusive against petitioners. Precisely the same question was decided in *In re Lewis' Will*, 18 N. Y. S. (2d) 133; 259 App. Div. 4; affd. per curiam by the Court of Appeals, 284 N. Y. 671; 30 N. E. (2d) 720, where an executor sought to deduct capital gain that was distributed to the residuary legatee along with corpus. The applicable New York statute is the same as section 162 (c) of the Federal revenue act. The court held:

> * * * In our opinion capital gain received by an estate becomes a payment of corpus, rather than of income, when distributed to a residuary legatee. A gain or surplus realized upon the sale of trust assets is an accretion of the capital fund and becomes part of the corpus; it is not currently distributable income. * * * By analogy it is clear that a capital gain realized by an estate * * * must also become an addition to the corpus of the estate and, while it represents capital income to the estate, it is corpus and not income when it is distributed to a legatee as part of the distribution of the total corpus.

Petitioners rely heavily upon the decision of the Second Circuit in *Weber* v. *Commissioner*, 111 Fed. (2d) 766, but we think that was a different case. The testator there left the residue of his estate to his three children, but directed his executors to sell all of his real property and divide the proceeds among the children. A farm, part of the residue, was sold by the executors and the proceeds so divided. The court held that the profit belonged and was taxable to the children in the first place, because title had vested in them at the testator's death; but that in any event, on the assumption that the estate realized the profit, the same result would be reached by reason of a deduction under section 162 (c), as the children were entitled to an immediate distribution. The direction to distribute the entire proceeds necessarily included the capital gain, and it was, therefore, proper to marshal the distribution against principal and income to the extent it represented each. The result in that case obtained by reason of the provisions of the will which, in effect, directed the distribution of the capital gain to the legatees. But in the instant case the will did not direct the sale that was made by the executors, nor did it specify that corpus, capital gain, or ordinary income be distributed. The fortuitous circumstance that part of the proceeds of sale were used in setting up residuary trusts does not mean that any part thereof was a distribution of income.

We conclude that the distribution was of corpus [5] and that petitioners are not entitled to a deduction under section 162 (c).

---

[5] The same principle governs the taxability of income for the final year of an estate or trust that is distributed to the legatee or beneficiary as part of the corpus. *Anderson* v. *Commissioner,* 126 Fed. (2d) 46; certiorari denied, —— U. S. ——; *Roebling* v. *Commissioner,* 78 Fed. (2d) 444; *Spreckels* v. *Commissioner,* 101 Fed. (2d) 721; *County National Bank & Trust Co. of Santa Barbara* v. *Helvering,* 122 Fed. (2d) 29; *Mabel I. Wilcox,* 43 B. T. A. 931; *William Stark Towne,* 42 B. T. A. 1046; *S. F. Durkheimer,* 41 B. T. A. 585; *Frazer* v. *Driscoll,* 46 Fed. Supp. 838.

Nor are we impressed by petitioners' final contention, which is that only 60 percent of the gain resulting from disposition of the installment obligations should be taken into account in computing net income. The stock sold by the executors had been held by them for more than one but less than two years, and the gain on the sale consequently fell within the 80 percent bracket under section 117 (a). The installment notes were held by the executors for a further period of approximately ten months, which, if tacked onto the period for which the stock was held, makes a holding period of more than two years and consequently within the 60 percent bracket. To support their position petitioners point to the provision in section 44 (d) that gain or loss resulting from the disposition of an installment obligation "shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received." Petitioners assert this means that "it is just as if a portion of the Virginian Railway stock, for purposes of determining the holding period, had been disposed of on November 6, 1937," the date on which the installment obligations were disposed of.

We think this is an inadmissible construction of the statute. The quoted sentence of section 44 (d) was added to the subsection by the Revenue Act of 1934 to make "it clear that where the profit on the sale or exchange of property is returned on the installment basis by spreading the profit over the period during which the installment obligations are satisfied or disposed of, such profit shall be taken into account under the brackets set forth in section 117 of the bill *according to the period for which the original property sold was held* rather than according to the period for which the installment obligations were held." (Emphasis supplied.) Senate Report 558, 73d Cong., 2d sess., p. 29. There was certainly no intention to permit taxpayers who avail themselves of the privilege of deferring the reporting of realized gain to drop into lower brackets depending upon the length of time the installment obligations were held. The gain was realized at the time of the sale and would have been taxable then in full but for the privilege granted of paying the tax as the unpaid installments were received. The gain "resulting" upon distribution of the installment obligations was the gain that had been realized upon the sale or exchange of a capital asset, namely, the railway company stock, and that asset had ceased to be held by the taxpayer at the time of the sale. The applicable holding period was the length of time the stock was held.

Reviewed by the Court.

*Decision will be entered under Rule 50.*