ERNESTINE M. CARMICHAEL TRUST NO. 21–35, MARSHALL COUNTY BANK & TRUST COMPANY, TRUSTEE, AND IRREVOCABLE LIVING TRUST CREATED BY ELLA L. MORRIS FOR ERNESTINE M. CARMICHAEL NO. 21–32, BREMEN STATE BANK, TRUSTEE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6171–76.     Filed October 18, 1979.

*William A. Cromartie, Burton H. Litwin,* and *Francis O. McDermott,* for the petitioners.

*Harmon B. Dow,* for the respondent.

WILBUR, *Judge:* Respondent determined the following deficiencies in the Federal income tax of two trusts:

*Ernestine M. Carmichael Trust No. 21–35*

1972 ............ $54,388.83

1973 ............ 329.97

*Irrevocable Living Trust Created by Ella L. Morris*
*for Ernestine M. Carmichael No. 21–32*

1972 ............ $1,041.36

The sole issue for decision is whether the long-term capital gain reported by each trust on its tax return for taxable year 1972 qualifies as "subsection (d) gain" within the meaning of section 1201(d)[1] for purposes of computing the alternative tax imposed by section 1201(b).[2]

### FINDINGS OF FACT

The facts have been fully stipulated pursuant to Rule 122, Tax Court Rules of Practice and Procedure. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioners are Marshall County Bank & Trust Co., the trustee of the Ernestine M. Carmichael Trust No. 21–35, and Bremen State Bank, the trustee of the Irrevocable Living Trust created by Ella L. Morris for Ernestine M. Carmichael No. 21–32. At the time the petitioners filed their joint petition in this case, Marshall County Bank & Trust Co. and Bremen State Bank had their principal offices at 315 North Michigan Street, Plymouth, Ind., and 104 West Plymouth, Bremen, Ind., respectively. Petitioners timely filed separate Federal fiduciary income tax returns (Forms 1041) for each trust for calendar year 1972 with

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable year 1972. In 1969, subject to certain transitional rules, Congress eliminated the alternative tax on capital gains in excess of $50,000 in any tax year. The alternative tax imposed a flat rate of 25 percent on a long-term capital gain and was more advantageous to an individual in a tax bracket above 50 percent than the standard method of simply deducting one-half of the gain. However, "subsection (d) gain," provided for in sec. 1201(d), preserved the alternative tax for gains prior to Oct. 9, 1969, including sales reported on the installment basis pursuant to sec. 453(a). See *infra.*

[2]Petitioners have not alleged any error with respect to the deficiency asserted against the Ernestine M. Carmichael Trust No. 21–35 for taxable year 1973.

the District Director, Internal Revenue Service, in Memphis, Tenn.

In July 1968, the Ernestine M. Carmichael Trust No. 21–35 (hereinafter Trust No. 35) and the Irrevocable Living Trust created by Ella L. Morris for Ernestine M. Carmichael No. 21–32 (hereinafter Trust No. 32) transferred shares of Associated Investment Co. common stock owned by them in exchange for Gulf & Western Industries, Inc., 5½-percent convertible subordinate debentures. Such exchanges were taxable transactions from which Trust No. 35 realized long-term capital gains of $8,020,870.79 and Trust No. 32 realized long-term capital gains of $692,476.02. Each trust properly elected to report its gain under the installment method pursuant to section 453. Since the parties have stipulated that these exchanges met the requirements for installment method reporting of gain, we will hereafter refer to the Gulf & Western Industries, Inc., debentures as "the Gulf & Western installment obligations" for purposes of clarity.

In 1972, each trust sold some of its Gulf & Western installment obligations on the open market. As a result of these sales, petitioners reported a $727,673.83 long-term capital gain for Trust No. 35 and a $150,648.29 long-term capital gain for Trust No. 32 on the Forms 1041 filed for taxable year 1972. Petitioners calculated the alternative tax under section 1201(b) for each trust by treating the gain reported from the sales of the Gulf & Western installment obligations as "subsection (d) gain." Respondent determined that the gain reported by each trust upon the sales of the Gulf & Western installment obligations did not qualify as "subsection (d) gain" and therefore recomputed the tax of each trust for the taxable year 1972 in accordance with such determination.

### OPINION

The issue presented for our decision is whether long-term capital gain reported by two trusts following sales in 1972 of corporate debentures they had received in a 1968 "installment sale" of stock qualifies as "subsection (d) gain," as defined by section 1201(d), for purposes of computing the alternative tax imposed by section 1201(b) on capital gains of noncorporate taxpayers.

Prior to modification by the Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 487, 635, the alternative tax, where applicable,

taxed all long-term capital gains of noncorporate taxpayers at the rate of 25 percent. In order to remedy the perceived dilution of the progressive tax rate structure caused by the flat-rate alternative tax,[3] Congress enacted section 511(b) of the Tax Reform Act of 1969, 83 Stat. 635, which increased the rates at which some capital gains were to be taxed. Applicable to taxable years beginning after December 31, 1969 (sec. 511(c), 83 Stat. 638), the new provisions basically retained the 25-percent rate only with respect to the first $50,000 of a noncorporate taxpayer's long-term capital gain. However, Congress specifically provided that certain long-term capital gains which arose from pre-October 9, 1969, transactions would continue to be taxed at the 25-percent rate, even if they exceeded $50,000. This tax regime was effected, in general, by the retention of the 25-percent rate of tax on "subsection (d) gain," statutorily defined by subsection 1201(d)[4] as follows:

SEC. 1201. ALTERNATIVE TAX.

(d) SUBSECTION (D) GAIN DEFINED.—For purposes of this section, the term "subsection (d) gain" means the sum of long-term capital gains for the taxable year arising—

(1) in the case of amounts received before January 1, 1975, from sales or other dispositions pursuant to binding contracts (other than any gain from a transaction described in section 631 or 1235) entered into on or before October 9, 1969, including sales or other dispositions the income from which is returned on the basis and in the manner prescribed in section 453(a)(1),

(2) in respect of distributions from a corporation made prior to October 10, 1970, which are pursuant to a plan of complete liquidation adopted on or before October 9, 1969, and

(3) in the case of a taxpayer other than a corporation, from any other source, but the amount taken into account from such other sources for the purpose of this paragraph shall be limited to an amount equal to the excess (if any) of $50,000 ($25,000 in the case of a married individual filing a separate return) over the sum of the gains to which paragraphs (1) and (2) apply.

Trust No. 35 and Trust No. 32 reported as components of their long-term capital gains for taxable year 1972, gains of $727,673.83 and $150,648.29, respectively, from sales during 1972 of Gulf & Western installment obligations they received as part of the consideration in a 1968 sale of stock. Since these gains

---

[3]H. Rept. 91–413 (Part 1) (1969), 1969–3 C.B. 290–291; S. Rept. 91–552 (1969), 1969–3 C.B. 544–545.

[4]Sec. 1901(a)(135)(C)(i), Tax Reform Act of 1976, 90 Stat. 1787, amended sec. 1201(d), I.R.C. 1954, for the taxable years beginning after 1976, by striking out the definition of "subsection (d) gain" and redesignating subsec. (e) as subsec. (d).

were properly reported after 1969, the gain in excess of $50,000 per trust[5] is subject to the higher rate of tax unless it qualifies as "subsection (d) gain."

Petitioners contend that the gain reported for taxable year 1972 from the disposition of the Gulf & Western installment obligations satisfies the requirements for "subsection (d) gain" status because, by virtue of section 453(d), it "relates back" to the underlying stock sales which were completed in 1968 and therefore "arises from" pre-October 9, 1969, sales.[6] Respondent, on the other hand, argues that the "relation back" rule of section 453(d) is not as expansive as petitioners contend and further argues that the amounts received upon the sales of the Gulf & Western installment obligations do not qualify as "subsection (d) gain" because they were neither reported in the manner prescribed under section 453(a)(1) nor were they received "pursuant to" the original installment sales.

This appears to be a case of first impression. The parties have presented both cogent technical arguments and arguments founded on congressional intent in support of their respective positions. While the matter is not completely free from doubt, we believe that petitioners properly calculated the alternative tax for 1972 by treating the entire gain from the sales of the Gulf & Western installment obligations as "subsection (d) gain."

Respondent contends that the gain reported by the trusts from the 1972 sales of the Gulf & Western installment obligations does not qualify as "subsection (d) gain" as that term is defined in section 1201(d)(1). Respondent interprets section 1201(d)(1) as defining "subsection (d) gain" as "amounts received 'pursuant to' binding contracts entered into on or before October 9, 1969" and argues that the amounts constituting the gain in this case were not received "pursuant to" such a contract. Respondent argues that the only amounts which would qualify for "subsection (d) gain" treatment under the facts of this case are amounts received in accordance with the terms of the contract of sale of the Associated Investment Co. stock.

Respondent's contention appears to be based on an erroneous

---

[5]The notices of deficiency show that respondent has allowed $50,000 of each trust's gain to be treated as "subsection (d) gain" under sec. 1201(d)(3).

[6]Sec. 453(d) provides that gain or loss resulting from the disposition of an installment obligation arising under sec. 453 "shall be considered as resulting from the sale or exchange of *the property* in respect of which the installment obligation was received." (Emphasis added.)

construction of section 1201(d)(1). The relevant portion of section 1201(d)(1) tersely defines "subsection (d) gain" as:

> * * * long-term capital gains for the taxable year arising:
>
> (1) in the case of amounts received before January 1, 1975, from sales or other dispositions pursuant to binding contracts * * * entered into on or before October 9, 1969. * * *

The phrase "pursuant to binding contracts" modifies the words "sales or other dispositions," not, as respondent posits, the words "amounts received." Consequently, the fact that the trusts did not receive the contested amounts "pursuant to" pre-October 10, 1969, binding contracts is immaterial so long as the gain arose from a sale completed prior to that date.

Respondent also contends that the gain does not qualify as "subsection (d) gain" because it was not returned "on the basis and in the manner" prescribed by section 453(a)(1) but rather in the manner prescribed by section 453(d)(1).[7] Respondent states that section 1201(d) defines "subsection (d) gain" as "amounts received pursuant to pre-October 10, 1969 contracts, including sales or other dispositions the income from which is returned on the basis and in the manner prescribed in section 453(a)(1)," which definition limits qualifying installment sale gain to gain reported under section 453(a)(1), and by negative inference, excludes gain reported under section 453(d)(1).

Petitioners, on the other hand, argue that section 1201(d) does not require that "subsection (d) gain" itself be computed under section 453(a)(1). Petitioners argue that the reference in section 1201(d) to section 453(a)(1) "merely serves to *identify* or *define* what kind of sales or other dispositions, i.e., installment transactions, which, if consummated before October 10, 1969, are to qualify for subsection (d) gain treatment." Petitioners also note

---

[7]Sec. 453(d)(1) provides:

(d) GAIN OR LOSS ON DISPOSITION OF INSTALLMENT OBLIGATIONS.—

(1) GENERAL RULE.—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and—

    (A) the amount realized, the case of satisfaction at other than face value or a sale or exchange, or

    (B) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange.

Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received.

that section 453(d), under which the trusts computed their gain in 1972, can only apply with respect to "sales the income from which is returned in the manner set forth in section 453(a)(1)."

We agree with petitioners that the language of section 1201(d)(1) does not limit the applicability of section 1201(d) to section 453(a)(1) transactions to the exclusion of section 453(d) transactions. From our reading of section 1201(d), the fundamental language defining "subsection (d) gain" is "gain * * * arising * * * from sales * * * including sales * * * the income from which is returned on the basis and in the manner prescribed in section 453(a)(1)." Respondent's construction of the "including" phrase as a strict limitation on sales, the gain from which will qualify as "subsection (d) gain," appears unwarranted in light of the rule of statutory construction that the use of the word "including" in a statutory definition conveys the conclusion that there are other kindred items includable within the defined term although not specifically enumerated. See *Argosy Limited v. Hennigan*, 404 F.2d 14 (5th Cir. 1968); *Federal Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941); 2A Sutherland, Statutes and Statutory Construction, sec. 47.07, p. 82 (4th ed. 1973). Rather, the phrase is illustrative only of one type of sale which, if the other conditions of section 1201(d) are met, would produce "subsection (d) gain."

Both parties speculate about the absence of any reference to section 453(d) in the legislative history accompanying section 1201(d). According to respondent, "the failure of Congress to suggest that premature sales of installment obligations to third parties would qualify as subsection (d) gain must be construed to mean that the Congress did not intend it to qualify."

Respondent points out that in 1969, Congress enacted section 453(b)(3)[8] to preclude taxpayers from deferring tax under

---

[8]Sec. 453(b) provides:

(b) SALES OF REALTY AND CASUAL SALES OF PERSONALTY.—

    (1) GENERAL RULE.—Income from—

        (A) a sale or other disposition of real property, or

        (B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000,

may (under regulations prescribed by the Secretary) be returned on the basis and in the manner prescribed in subsection (a).

    (2) LIMITATION.—Paragraph (1) shall apply only if in the taxable year of the sale or other disposition—

        (A) there are no payments, or

section 453 in certain cases and argues that "Congress was aware of the different treatment of installment obligations under section 453 at the very time it was considering the question of subsection (d) gain." Respondent seems to argue that the Congress' failure to mention section 453(d) in section 1201(d) was intentional rather than inadvertent. Petitioners seem to view the absence from section 1201(d) of a specific reference to section 453(d) as an oversight which occurred during the legislative process of revising the alternative tax. Petitioners argue that no adverse conclusions concerning congressional intent with respect to the disposition of installment obligations can be attributed to the absence of any reference to such dispositions in the legislative history relevant to section 1201.

The most we can say about the absence of any mention of section 453(d) in the legislative history to section 1201(d) is that Congress never specifically considered the effect of the enactment of the latter section on dispositions of installment notes. The reference to section 453 sales was included by the Senate Committee on Finance. As originally reported by the House Ways and Means Committee, H.R. 13270 (which, after numerous amendments, was enacted as the Tax Reform Act of 1969) would have eliminated the alternative capital gains tax for noncorporate taxpayers effective with respect to sales and other dispositions after July 25, 1969. According to the conference report, the result of the originally-proposed provision would have been that "after [July 25, 1969] noncorporate taxpayers are to include one-half of their net long-term capital gains in income without regard to their tax rate bracket." H. Rept. 91–782 (1969), 1969–3 C.B. 667.

The Senate Committee on Finance substantially modified the

---

(B) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

(3) PURCHASER EVIDENCES OF INDEBTEDNESS PAYABLE ON DEMAND OR READILY TRADABLE.—In applying this subsection, a bond or other evidence of indebtedness which is payable on demand, or which is issued by a corporation or a government or political subdivision thereof (A) with interest coupons attached or in registered form (other than one in registered form which the taxpayer establishes will not be readily tradable in an established securities market), or (B) in any other form designed to render such bond or other evidence of indebtedness readily tradable in an established securities market, shall not be treated as an evidence of indebtedness of the purchaser.

It is not disputed that the Gulf & Western installment obligations were marketable securities. However, the rule of sec. 453(b)(3) was made effective for transactions occurring after May 27, 1969. Sec. 412(b), Tax Reform Act of 1969, 83 Stat. 609.

House provision. The Senate provision introduced the concept of "subsection (d) gain."[9] The committee report accompanying the Senate proposals explains the concept in part as a transitional rule which exempts from the general repeal of the alternative tax "sales or dispositions under binding contracts that were in effect on October 9, 1969," even though the sales were consummated after that date and "installment sale payments received after the effective date of the change on sales on or before October 9, 1969, or pursuant to binding contracts in effect on that date." S. Rept. 91–552 (1969), 1969–3 C.B. 546. The only modification made to the Senate proposal by the Conference Committee that is relevant to this decision was to limit the continuation of the 25-percent tax rate in the case of "payments received pursuant to certain binding contracts and installment sales" to amounts received before 1975. H. Rept. 91–782 (1969), 1969–3 C.B. 668. Thus, the reference in section 1201(d) to section 453(a)(1) is explainable as an intended clarification of the status of installment payments received after 1969 but which relate to sales made before October 10, 1969. However, the fact that Congress specifically addressed the problem of section 453(a)(1) installment payments received after 1969 without mentioning section 453(d) does not mean that payments reported under section 453(d) were not to be covered by the transitional rules. This seems particularly true in light of the ameliorative features of the transitional rule of 1201(d) and the philosophy underlying section 453.

Section 453, in general, allows a taxpayer to elect to report gain realized on certain qualifying sales on an installment basis, thereby deferring a portion of the tax stemming from the gain on the sale. The installment method of reporting income for Federal tax purposes was first authorized by statute in section 212(d), Revenue Act of 1926, ch. 27, 44 Stat. (Part 2) 23, and was designed to avoid the hardships of income "bunching" in the

---

[9]The Senate revision to H.R 13270, 91st Cong., 1st Sess. (1969), defined "subsection (d) gain" in pertinent part as follows:

(d) Subsection (D) Gain Defined.—For purposes of this section, the term "subsection (d) gain" means the sum of the long-term capital gains for the taxable year arising—

(1) from sales or other dispositions pursuant to binding contracts (other than any gain from a transaction described in section 631 or 1235) entered into on or before October 9, 1969, including sales or other dispositions the income from which is returned on the basis and in the manner prescribed in section 453(a)(1) * * *

year of sale when the seller received certain debt obligations but did not receive cash or the equivalent of cash which would provide him with funds to pay the tax due on the gain. S. Rept. 52, 69th Cong., 1st Sess. (1926), 1939–1 C.B. (Part 2) 332, 346; H. Rept. 356, 69th Cong., 1st Sess. (1926), 1939–1 C.B. (Part 2) 361, 363; H. Rept. 91–413 (1969), 1969–3 C.B. (Part 1) 200, 267. In 1928, Congress enacted section 44(d), Revenue Act of 1928, ch. 852, 45 Stat. (Part 1) 806,[10] to terminate the privilege of reporting gain on the installment method where a taxpayer who had elected installment method reporting subsequently disposed of unpaid installment obligations. The House and Senate Committee Reports, H. Rept. 2, 70th Cong., 1st Sess. (1927), 1939–1 C.B. (Part 2) 384, 394; S. Rept. 960, 70th Cong., 1st Sess. (1928), 1939–1 C.B. (Part 2) 409, 425, explained the objectives of the 1928 legislation in identical language:

Subsection (d) contains new provisions of law to prevent evasion of taxes in connection with the transmission of installment obligations upon death, their distribution by way of liquidating or other dividends, or their disposition by way of gift, or in connection with similar transactions. The situations above specified ordinarily do not give rise to gain and yet at the same time it is urged that they permit the recipient to obtain a greatly increased basis in his hands for the property received, except in the case of gifts. It therefore seems desirable to clarify the matter. The installment basis accords the taxpayer the privilege of deferring the reporting at the time of sale of the gain realized, until such time as the deferred cash payments are made. To prevent the evasion the subsection terminates the privilege of longer deferring *the profit* if the seller at any time transmits, distributes, or disposes of the installment obligations and compels the seller at that time to report *the deferred profits*. The subsection also modifies the general rule provided in subsection (a) for the ascertainment of the percentage of profit in the deferred payments, in those cases in which the obligations are satisfied at other than their face value or are sold or exchanged. The modification permits a compensating reduction in the percentage of profit in case the obligations are satisfied at less than their face value, or are sold or exchanged at less than face value.

Whether or not the gain or loss realized under the section is recognized for tax purposes, depends upon general principles of law embodied in the income

---

[10]Sec. 44(d), Revenue Act of 1928, provided:

(d) GAIN OR LOSS UPON DISPOSITION OF INSTALLMENT OBLIGATIONS.—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and (1) in the case of satisfaction at other than face value or a sale or exchange—the amount realized, or (2) in case of a distribution, transmission, or disposition otherwise than by sale or exchange—the fair market value of the obligation at the time of such distribution, transmission, or disposition. The basis of the obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full.

tax provisions, the exchange of installment obligations in connection with tax-free exchanges, for instance, being cared for by section 112.

[Emphasis added.]

Section 44(d), Revenue Act of 1934, ch. 277, 48 Stat. (Part 1) 680, 695,[11] carried over substantially the same language as that of section 44(d) of the 1928 Act, with the following pertinent addition:

Any gain or loss so resulting [from the disposition of an installment obligation] shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received.

This language has been preserved, unchanged, in the flush language of section 453(d)(1).[12] The purpose of the 1934 legislation was to ensure that any profit reported on the disposition of installment obligations would be characterized as long-term or short-term gain according to the period for which the original property sold had been held, rather than according to the period

---

[11]Sec. 44(d), Revenue Act of 1934, provided:

(d) GAIN OR LOSS UPON DISPOSITION OF INSTALLMENT OBLIGATIONS.—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and (1) in the case of satisfaction at other than face value or a sale or exchange—the amount realized, or (2) in case of a distribution, transmission, or disposition otherwise than by sale or exchange—the fair market value of the obligation at the time of such distribution, transmission, or disposition. Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received. The basis of the obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full. This subsection shall not apply to the transmission at death of installment obligations if there is filed with the Commissioner, at such time as he may by regulation prescribe, a bond in such amount and with such sureties as he may deem necessary, conditioned upon the return as income, by the person receiving any payment on such obligations, of the same proportion of such payment as would be returnable as income by the decedent if he had lived and had received such payment.

[12]Sec. 453(d) provides, in part:

(d) GAIN OR LOSS ON DISPOSITION OF INSTALLMENT OBLIGATIONS.—

(1) GENERAL RULE.—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and—

(A) the amount realized, in the case of satisfaction at other than face value or a sale or exchange, or

(B) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange.

Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received.

(2) BASIS OF OBLIGATION.—The basis of an installment obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full.

for which the installment obligations were held. S. Rept. 558, 73d Cong., 2d Sess. (1934), 1939–1 C.B. (Part 2) 586, 608; H. Rept. 1385, 73d Cong., 2d Sess. (1934), 1939–1 C.B. (Part 2) 627, 629.

Although respondent states that "the purpose of section 453(d) is to *abort* the operation of section 453(a)(1) and (b)(1)," we view the purpose as being to accelerate the reporting of gain already realized and technically recognized but not yet reported.[13] Except for establishing the time when profit is to be taxed, with the consequent possibility that a change in the tax laws in the interval between the initial installment sale and the disposition of the installment obligations may result in a differing rate of tax or the recharacterization of the asset and hence the nature of the gain (see *Snell v. Commissioner*, 97 F.2d 891 (5th Cir. 1938), affg. a Memorandum Opinion of this Court), the disposition of installment obligations is given no effect independent from the original sale. Thus, under section 453(d)(2), the basis of obligations received in an installment sale is a direct function of the basis of the property originally sold.[14] In addition, there is no "tacking" of the holding periods of the installment obligations and the property originally sold. Rather, the character of any gain on disposition of the installment obligations is determined solely by the holding period of the underlying asset. *Estate of Rogers v. Commissioner*, 1 T.C. 629 (1943), affd. 143 F.2d 695 (2d Cir. 1944), cert. denied 323 U.S. 780 (1944). Furthermore, the nature of the gain on the disposition of an installment obligation is determined by whether the underlying property sold was a capital asset or an ordinary-income producing asset. There is no allocation of the gain reported on disposition of installment obligations between the underlying sale transaction and the subsequent disposition transaction. In sum, the gain "resulting" from the disposition of installment obligations is the gain that previously was realized on the sale of the underlying asset, but was not yet reported. *Estate of Rogers*

---

[13]As one commentator has written:

"The statute [sec. 453(d)] is careful not to say that gain or loss shall be "recognized" upon the disposition of an installment obligation. Since section 453 provides for income deferral and not for nonrecognition (the gain from a sale reported under section 453 having been both realized *and* recognized), it would be erroneous to describe the disposition of an installment obligation as a gain or loss recognizing event. The activation of section 453(d) simply triggers the inclusion of the previously deferred income or, if the obligation is disposed of in a loss context, allows the taxpayer a loss which may be deductible. * * * [M. Emory, "Disposition of Installment Obligations: Income Deferral, 'Thou Art Lost and Gone Forever,'" 54 Iowa L. Rev. 945, 948 (1969). Emphasis in original; fn. ref. omitted.]"

[14]See sec. 1.453–9(b)(3), example *(1)*, Income Tax Regs.

*v. Commissioner*, 1 T.C. at 639; H. Rept. 2, 70th Cong., 1st Sess. (1927), 1939–1 C.B. (Part 2) 384, 395, and S. Rept. 960, 70th Cong., 1st Sess. (1928), 1939–1 C.B. (Part 2) 409, 425, quoted above; cf. *Smith v. Commissioner*, 56 T.C. 263, 285 (1971).

Applying these principles to the facts of this case, it is apparent that the gain "resulting" from the sales of the Gulf & Western installment obligations was the gain that had been realized upon the sales of the Associated Investment Co. stock. The stock sales occurred in 1968. Accordingly, the gain from the sales of the Gulf & Western installment obligations was gain "arising * * * from sales * * * entered into on or before October 9, 1969," and, therefore, qualifies as "subsection (d) gain."

*Decision will be entered under Rule 155.*